## Shrader, Trustee, v. Commercial Coal Mining Co., Appellant.

*Mines and mining—Leases—Construction — Share of profits — Deduction of losses—Intention—Partnership—Practice—Equity— Parties—Assignee.*

1. A mining company leased to another mining company two coal mines known as mine No. 2 and mine No. 5; the lease provides that during the life of mine No. 2, the lessee shall apply two-thirds of the net profits to the reduction of the indebtedness of the lessor; and, upon cancellation of such indebtedness, that share shall be paid to the lessor; it further provides that the net profits or earnings of mine No. 5 shall be applied, "until the payment in full of the cost of equipping, developing and putting in condition for operation of said mine No. 5 with interest at the rate of six per cent. per annum, ......to the reduction and payment thereof, the same being applied monthly so far as the same will suffice such payment or reduction. After said indebtedness is liquidated and paid in consideration of the assignment of said lease and use of the machinery and equipment of the lessor, the lessee agrees to pay to the lessor during the life of this agreement a sum equal to one-half of the said net profit derived from the operation of the said mine No. 5, and also one-half of the net profit derived from the operation of the adjoining tracts leased or

purchased by the lessee in the operation of which the plant and machinery of the lessor is utilized. This sum shall be paid to the lessor quarterly in each year during the continuance of this agreement........The amount of the profits shall be ascertained and applied as herein provided, at least once in every three months and a statement thereof rendered by the lessee to the lessor at that time and in the month of January in each year during the continuance of this agreement a full statement shall be rendered of the entire operation and transactions hereunder up to the 31st of December preceding." It is also agreed that the monthly and quarterly statements shall be conclusive if not audited within sixty days. It is further provided that the agreement shall not be construed as creating or attempting to create a partnership "or as imposing any of the liabilities thereof." The lessor contended that, under the contract, upon the ascertainment of the profits for a given period, no deduction should be made for losses occurring in the preceding period, but such losses should be borne by the lessee. The lessee contended that the rule applicable to the division of profits of a partnership should be applied and losses resulting during one period should be carried over and deducted from the profits earned during a subsequent period. *Held,* that the rules applicable to partnership agreements did not apply; and that after the profits had been ascertained for a certain period, they could not be diminished because of losses sustained during a previous period.

2. Where in such case the agreement required the lessor to develop and equip mine No. 5 and provide the necessary funds for that purpose and stipulated that the expenditure for said machinery and the cost of the development of the said mine No. 5 should include only labor and cost of material and personal property purchased for that purpose, and there should be no charge for general superintendent, management or supervision; and the total amount of expenditure to be made and indebtedness incurred for the purpose aforesaid should not exceed the sum of twenty-five thousand dollars, all renewals or replacements of original equipment to be charged to the cost of production; and it appeared that the mine had been fully equipped by the lessor at a cost of about $20,000, and the company later decided to re-equip the mine for operation by electrical power to be purchased from a local electric company, and abandoned its boiler house and dynamos then in use, and erected new buildings and equipment at a cost of $37,000, the entire expense of the new equipment as well as the old equipment, amounting to $57,000, could not be charged against the cost of operation in view of the limitation of expense for this purpose to $25,000; and the lower court properly so decided.

3. Where in such case the lessor assigned its interest in the con-

tract to an assignee, and in proceedings by the assignee to have the assignment specifically enforced, it was found by a court of bankruptcy that the lessor was insolvent at the time the transfer was made and the assignee was directed to surrender the assignment, there was no necessity for the assignee to be made a party to the proceedings.

4. In such case, the contention that there was an earlier assignment was without merit where it appeared that such assignment had never been delivered by the assignor.

Argued Jan. 16, 1918.   Appeal, No. 232, Jan. T., 1917, by defendant, from decree of C. P. No. 4, Philadelphia Co., Sept. T., 1914, No. 4750, for plaintiff, on bill in equity for an accounting, in case of James F. Shrader, Trustee in Bankruptcy of the Black Lick Mining Company, v. Commercial Coal Mining Company. Before BROWN, C. J., STEWART, MOSCHZISKER, FRAZER and WALLING, JJ.   Affirmed.

Bill in equity for an accounting for money alleged to be due plaintiff under a coal lease.   Before FINLETTER, J.

The opinion of the Supreme Court states the facts.

The court granted the relief prayed for.   Defendant appealed.

*Errors assigned* were in dismissing exceptions to findings of fact and law and the decree of the court.

*William A. Glasgow, Jr.*, with him *Evans & Evans, Samuel Scoville, Jr.*, and *Chester N. Farr*, for appellant.

*H. B. Gill*, with him *W. B. Linn*, for appellee.

OPINION BY MR. JUSTICE FRAZER, March 18, 1918:

Defendant appeals from a decree ordering it to account to plaintiff, trustee in bankruptcy of the Black Lick Mining Company, for the net earnings of two coal mines operated by defendant under agreement with the Black Lick company.

The Black Lick Mining Company operated a coal mine known as No. 2, under a lease from the estate of Charles McFadden, deceased, and, being largely indebted, entered into a contract with the Commercial Coal Mining Company, the defendant, whereby the latter company agreed to operate the mine and finance the indebtedness of the former company, in consideration of one-third the net profits of the undertaking. The contract remained in force approximately three years, until January 12, 1917, when it was superseded by the agreement now before the court for construction. This agreement, after reciting that the Black Lick Mining Company was about to procure from the estate of Charles McFadden, deceased, a lease of an additional mine known as No. 5, provided that such lease should be assigned to the Commercial Coal Mining Company, and that the latter would continue to operate mine No. 2, and also provide the necessary capital to "develop and equip and put in condition for operation" mine No. 5; the Black Lick company to afford the Commercial company "free use of all sidings, tipples, building, power plants, machinery and equipment" of mine No. 2, with right to use them in connection with the operation of No. 5, and to remove the same to the latter mine upon the former becoming exhausted. The Commercial company also agreed to finance the remaining indebtedness of the Black Lick company, amounting to $21,723.77, until that sum was paid out of the share of the profits of the mines becoming due and payable to the Black Lick company.

The principal question in dispute, under the agreement, is the method of computing the compensation the Black Lick company is entitled to receive. It is first provided that, during the life of mine No. 2, the Commercial company shall apply annually two-thirds of the net profits of that mine to the reduction of the indebtedness of the Black Lick company, and, upon cancellation of such indebtedness, the share shall be paid to the Black Lick company, and further, as follows:

"11. The net earnings or profits from the operation of mine No. 5, shall be applied as follows:

"Until the payment in full of the cost of equipping, developing and putting in condition for operation of said mine No. 5 with interest at the rate of six (6) per cent. per annum, the same shall be applied to the reduction and payment thereof, the same being applied monthly so far as the same will suffice such payment or reduction. After said indebtedness is liquidated and paid in consideration of the assignment of said lease and use of the machinery and equipment of the Black Lick company the Commercial company agrees to pay to the Black Lick company during the life of this agreement a sum equal to one-half of the said net profit derived from the operation of said mine No. 5, and also of one-half of the net profit derived from the operation of the adjoining tracts leased or purchased by the Commercial company in the operation of which the plant and machinery of the Black Lick company is utilized. This sum shall be paid to the Black Lick company quarterly in each year during the continuance of this agreement.

"12. The amount of the profits shall be ascertained and applied as herein provided, at least once in every three months and a statement thereof rendered by the Commercial company to the Black Lick company at that time, and in the month of January in each year during the continuance of this agreement a full statement shall be rendered of the entire operation and transactions hereunder up to the 31st of December preceding. It is understood that the monthly and quarterly statements rendered as herein provided shall be for the purpose of the information of the parties merely and shall not be binding or conclusive. With respect to the annual statement rendered in January, the Black Lick company shall have the right to have the accounts to which the said statement relates audited within sixty (60) days of the time of the rendition of said statement, and if not so

audited the same shall be conclusive upon both the parties hereto."

A subsequent paragraph of the agreement requires the Commercial company to pay the Black Lick company $125 on the 20th day of each month "during the continuance of this agreement," such payments to be "charged against its account and to be deducted from the profits which may become due the Black Lick company," the payments, however, to cease "whenever the earnings from No. 5 mine amount to a sufficient sum to pay the Commercial company for their expenditures for equipment and development." This provision was apparently inserted to assure the Black Lick company a certain and steady income or return from the mines during the existence of the old indebtedness and while the profits from mine No. 5 were being applied to the cost of its equipment and development.

The contention of plaintiff is that under the foregoing provisions of the contract, upon ascertaining the profits for the monthly, quarterly or annual period, no deduction should be made for losses occurring in the preceding period, but such losses should be borne by the Commercial company. On the other hand, the latter contends the general rule applicable to a division of profits of a partnership should be applied and losses resulting during one period carried over and deducted from profits earned during a subsequent period, notwithstanding the fixing of a regular time for their calculation and distribution.

In the first place the contract is more in the nature of a lease of coal in place in consideration of a share of profits in lieu of royalties, than a partnership agreement. In fact, it accompanied an assignment of a coal lease from the estate of Charles McFadden, deceased, to the Black Lick company, made pursuant to an oral agreement between McFadden, in his lifetime, and the Black Lick company, which had been partly carried out before McFadden's death; and to complete the transfer the Or-

phans' Court subsequently directed his executors to make a lease afterwards assigned to the Commercial company with the consent of the trustee of the McFadden estate. The assignment being absolute the agreement was necessary to secure the Black Lick company a proper revenue from its mining rights, which were of considerable value, but which the company, owing to its lack of capital, was unable to properly develop. No liability with reference to the operation of the mine is imposed on the Black Lick company, and until the happening of a particular event it is entitled to receive $125 a month, chargeable against the "sum equal to one-half the profits," payable by the Commercial company. The Black Lick company reserved the right to terminate the agreement and retake possession of the mines and equipment in case of failure on the part of the Commercial company to perform the covenants contained therein, and further provided that "nothing in this agreement contained shall be construed as creating or attempting to create a partnership between the parties hereto or as imposing any of the liabilities thereof." Under these circumstances it is difficult to see how a liability for losses can be fastened upon the Black Lick company in the absence of a provision to that effect in the contract. Paragraph 11 of the contract, quoted above, contemplates two different plans of applying profits derived from mine No. 5: First, a monthly payment until the cost of equipping and developing the mine is paid; second, after such debt is cancelled to pay to the Black Lick company quarterly "a sum equal to one-half" the net profits. On the other hand, paragraph 8 required the earnings of mine No. 2 to be applied yearly, though there is an apparent conflict between this provision and paragraph 12, which requires the profits to be "ascertained and applied as herein provided at least once in every three months and a statement thereof rendered" at that time and a "full statement" made in January of each year. This requirement of paragraph 12 refers

generally to the matter of accounting, and must yield to the more specific provisions of paragraph 8 covering the application of profits. The further provision that "it is understood that the monthly and quarterly statements rendered as herein provided shall be for the information of the parties merely and shall not be binding" is not conclusive of an intention to carry losses to subsequent months throughout the year, but indicates only that particular items of the monthly and quarterly accounts shall not be held indisputable in the final account at the end of the year. The information was evidently needed for the purpose of ascertaining the amount of profits to be credited to the Black Lick company, as well as the amount of royalties due the McFadden estate, the original lessor, it being provided in the lease that royalties shall be paid monthly and a full account rendered every three months. The monthly accounts between the parties to this action are provided for in paragraph 9 of the agreement, as follows: "The Commercial company shall on or before the 20th day of each month during the continuance of this agreement furnish to the president of the Black Lick company a true and accurate report of the cost of the operation, showing in detail all the expenditures made or indebtedness incurred in said operation during the preceding calendar month. At the same time also the Commercial company shall make a full and accurate report of all coal shipped from No. 2 and No. 5 mines during the preceding calendar month and price received for same. The accounts of sales of coal from No. 2 and No. 5 mines shall be kept separate and apart from each other and separate and apart from the sales of coal from other mines operated by the Commercial company so that the quantity produced and sold from each mine may be ascertained."

Nothing is found in the above provisions, or in other parts of the contract, to indicate the Black Lick company shall share the losses. If, however, we adopt appellant's theory of construction of the contract, the fur-

ther question arises, at what time should the profits be finally ascertained, and for what period should the right to apply future profits to past losses continue? There is no more reason under the contract for taking a yearly than a monthly period. Under the partnership theory, since the parties contemplated the contract to last until the exhaustion of the mine, a final accounting is not possible until that time. The terms of the agreement, however, do not warrant such construction and the parties expressly provide to the contrary. We agree with the court below, and hold the profits should be computed and divided at the periods stated, without deduction for losses sustained in the preceding period.

The next question to be considered is whether the cost of a new electrical equipment for mine No. 5 is properly chargeable as an operating expense. Paragraph 10 of the agreement requires the Commercial company to develop and equip the mine and provide the necessary funds for that purpose, and stipulates that "The expenditure for said machinery and the cost of the development of the said mine No. 5 . . . . . . shall include only labor and cost of material and personal property purchased for that purpose, and there shall be no charge for general superintendent, management or supervision. The total amount of the expenditure to be made and indebtedness incurred for the purpose aforesaid shall not exceed the sum of twenty-five thousand dollars ($25,-000). All renewals or replacements of original equipment under this clause shall be charged to the cost of production." Paragraph 13, after stating in detail the expense to be included in the cost of operation, provides that "In addition, there shall be charged against the cost of operation, the cost of all renewals or replacements of machinery as hereinbefore provided, including as well renewals or replacements of the equipment, machinery and property of the Black Lick company loaned hereunder, as that purchased by the Commercial company." In paragraph 17 it is provided that "If during the life

of this agreement any new machinery or new equipment is added, not replacing the old machinery or equipment, the cost of the same being charged to the cost of coal as hereinabove provided, the same shall be valued by three disinterested parties, one to be appointed by the Black Lick company, one by the Commercial company and the two so appointed to choose the third." Following the statement that both parties shall be given an opportunity to purchase at the appraised value it is provided that if neither desire to purchase the property shall be sold and the proceeds divided equally between them.

The court below found that mine No. 5 had been fully equipped in 1909 by defendant company at an expense of about $20,000, and the company later decided to re-equip the mine for operation by electrical power to be purchased from a local electric company, and conformably to such plan abandon the boiler house and dynamos then in use, and erect a new substation and install new machinery and equipment at a total cost of $37,000. The entire expense of the new equipment as charged against the cost of operation, made a total outlay of $57,000, notwithstanding the expense for this purpose was specifically limited to $25,000. The term "renewals and replacements" specified in paragraph 10 as a proper charge against cost of operation contemplates replacements from time to time to take the place of defective or worn parts, and refers only to machinery purchased for that purpose. An expenditure to replace machinery or equipment not unfit for use but abandoned pursuant to a plan to change the method of operation, is not contemplated by the agreement. Considering the new electrical equipment a "replacement of original equipment" under paragraph 10 the amount chargeable to the cost of production is limited to $25,000. The property in question was not purchased to replace worn out machinery, but because the Commercial company believed a more economic operation of the mine would result from the change and it contends results justified the ex-

penditure. While this may be true, the question was one of business policy and a matter for it to decide, and if a saving resulted it received the benefit. While it is true the Black Lick company also derived a benefit this was one of the incidents of carrying out the agreement of the Commercial company.

In view of the express restrictions in paragraph 10, the parties did not intend to place within the power of the Commercial company, without limitation, to charge against profits the cost of an entire change in the equipment of the mines.

The remaining question included in the statement of questions involved is whether E. R. Norton, an assignee of the interest of the Black Lick company in the contract, should have been made a party to the proceeding. On January 24, 1913, the Black Lick company assigned to Norton its interest in the contract with the Commercial company as collateral security for the payment of certain notes. On August 6, 1914, Norton presented a petition to the United States District Court in the bankruptcy proceedings against the Black Lick company, to have this assignment specifically enforced. The referee found the Black Lick company was insolvent at the time the transfer was executed, and dismissed the petition and ordered Norton to surrender the assignment, which order was subsequently affirmed by the court. No claim is made under this transfer, but, on January 27, 1916, the Commercial company was notified that Norton held an assignment dated November 26, 1912, also securing the payment of certain specified notes and indebtedness, and it is on this earlier dated assignment that Norton's position as a party is based. Charles McFadden, who executed the transfer on behalf of the Black Lick company, testified he personally prepared and forwarded an executed assignment to Norton, dated November 26, 1912, which was, however, not satisfactory to the latter, who then had his counsel prepare the one dated January 24, 1913, which was subsequently executed. In view of

the testimony and of the finding of the court below to the effect there was no delivery of the earlier assignment, but the latter one which was declared void by the bankruptcy court, discussion of the question is unnecessary.

The decree of the court below is affirmed.