## HENRY HUGHES AND OTHERS v. S. R. MICKA AND OTHERS.

130 N. W. (2d) 505.

September 4, 1964—No. 39,414.

*Mulvahill & Mulvahill, Sullivan, McMillan, Hanft & Hastings, Edward T. Fride,* and *C. Byron Holje,* for appellants.

*Naughtin & Naughtin* and *David Naughtin,* for respondent Fish.
*C. G. Anderson, I. R. Galob, Hultstrand, Abate & Wivoda,* and
*James V. Abate,* for other respondents.

MURPHY, JUSTICE.

This is an appeal from a judgment dismissing with prejudice an equitable action to restrain performance of an alleged illegal contract by municipal officials of the village of Hibbing. The Water, Light, Power and Building Commission of the village of Hibbing proposes to purchase a new 7,500 kilowatt generator and auxiliary equipment, costing in the neighborhood of $700,000, and pay for it out of the commission's Reserve for Replacement Fund. Appellants contend that the proposed acquisition is an "expansion, extension, addition, change, modification or improvement" of the existing electric light plant and must be financed by the sale of revenue anticipation certificates with approval of the majority of voters of the municipality. The trial court agreed with the commission that the acquisition represented a "replacement" which may be legally financed out of the Reserve for Replacement Fund.

In considering the issue presented we must examine the various statutory provisions as they relate to the establishment and management of the utility. By L. 1951, c. 680, § 4, a general fund designated as "Water and Light Fund" is authorized. The applicable portion of that statute provides:

"The commission shall collect all water, light, gas, heat, steam and power charges from patrons including the village, and pay the same into a fund to be known and designated as the 'Water and Light Fund'. * * * except as hereinafter otherwise provided, all moneys paid into the water and light fund shall be available for the making of expenditures, and may be pledged for the repayment and security of money borrowed, for any purpose for which the commission is authorized to expend or borrow money on behalf of the village."

By L. 1951, c. 680, § 10, the legislature provided for a reserve fund designated as a "Reserve for Replacement Fund." That section, so far as applicable here, provides:

"It shall be the duty of the commission on or before the 20th day of each month to set aside into a reserve for replacement fund, a sum equal to not less than 10 per cent of the gross receipts collected by the commission during the preceding month, provided that such sum shall be so set aside only out of moneys remaining in the water and light fund after payment of all amounts then due for expenses of operation and maintenance of the utilities, and after setting aside all amounts required for the payment and security of any revenue anticipation certificates issued pursuant to Section 5 hereof, as provided in the proceedings authorizing the issuance of such certificates. This reserve for replacement fund shall be used by the commission only for the purpose of replacing existing buildings, plants, systems, equipment and other fixed assets as carried on the books of the commission. No replacement of any of the foregoing from said fund shall be made if the cost of such replacement is less than $2,000. The commission is hereby prohibited from using the reserve fund for any other purpose except the commission may resolve to use any part thereof to retire revenue anticipation certificates when and as the same become redeemable by their terms or by the consent of the holders thereof, and any moneys in said reserve fund shall be used to pay principal and interest when due on revenue anticipation certificates to the extent such certificates shall represent cost of replacements, if other moneys then in the Water and Light Fund are insufficient for such purpose."

The legislature provided by L. 1953, c. 655, § 2, for the financing of expenses incurred by "expansions, extensions, additions, changes, modifications and improvements" by issuance of revenue anticipation certificates. This provision also permits payment for replacements when the reserve fund is inadequate. The applicable portion provides:

"The commission is hereby authorized to issue revenue anticipation certificates to pay for expansions, extensions, additions, changes, modifications and improvements of any or all of the utility plants and systems under its jurisdiction, and to pay for replacements of parts of any and all of said plants and systems when the reserve for replacement fund is determined by the commission to be inadequate to pay for all replacements immediately required and for antici-

pated emergencies. * * * Such revenue anticipation certificates shall be issued only with the approval of the majority of the voters of the municipality voting upon the question of such issuance at any general or special village election; except that such certificates for replacement of the existing plants and systems or any part thereof in an aggregate amount outstanding not exceeding $250,000 and such certificates for expansion, extension, addition, change, modification or improvement of the existing plants and systems or any part thereof in an aggregate amount outstanding not exceeding $100,000 may be issued by the commission without the necessity of an election thereon. The determination of the commission shall be conclusive, in favor of the holders of all revenue anticipation certificates at any time outstanding, as to the amount thereof which represents replacement, and as to the adequacy or inadequacy of the reserve for replacement fund for any replacements financed by such revenue certificates."

■ From an examination of these statutes certain general observations may be made. The Water and Light Fund is a general fund available for the payment of current expenditures, out of which the commission is to set aside 10 percent of the gross receipts to be placed in the Reserve for Replacement Fund. This fund may be used by the commission to replace "existing buildings, plants, systems, equipment and other fixed assets." The act comprehends that the commission may expend large amounts from this fund. The maximum amount which they may disburse from it is not fixed, but the minimum is placed at not less than $2,000. When the commission determines to finance costs of "expansion, extension, addition, change, modification or improvement" of the utility, and to pay for replacements when the replacement fund is inadequate, revenue anticipation certificates may be issued with the approval of the majority of the voters of the municipality.[1] The line of demarcation between extensions, expansions, etc. which may require financing by anticipation certificates approved by the voters and replacements which do not require such approval is

---

[1] The complaint alleges that at the time the action was started there was approximately $1,200,000 in the reserve fund.

unclear and no attempt will be made to define the precise limits of application of the two statutes under consideration. It may be observed that to a certain extent authority of the commission to provide for financing is duplicated under both statutes. It is obvious that a replacement under L. 1951, c. 680, § 10, might also be considered as an improvement under the provisions of L. 1953, c. 655, § 2. It seems obvious that the legislature intended to give the commission broad and flexible powers to meet financial problems in the administration of the utility. That the legislature has vested the commission with broad discretionary power is apparent from the authority given which permits it to provide for financing by means of anticipation certificates up to an amount of $250,000 without the necessity of an election. Moreover, the last sentence of the above-quoted portion of L. 1953, c. 655, § 2, is significant since the legislature there left to the "conclusive" determination of the commission in favor of holders of revenue anticipation certificates as to the amount of outstanding certificates which represents cost of replacement and "as to the adequacy or inadequacy of the reserve for replacement fund for any replacements financed by such revenue certificates."

We would conclude from the language of these statutes that replacement of obsolete or worn-out equipment may, depending upon the circumstances, be financed in whole or in part under either statute. If there is a general line of demarcation to be drawn between the two sections, it might be said that under L. 1951, c. 680, § 10, the commission has broad and flexible powers to expend money which may involve large amounts for the replacements of "buildings, plants, systems, equipment and other fixed assets" without submitting the expansion of such improvements to the voters for approval. It is apparent that the legislature intended that the reserve fund be available so that the municipal power system would not find itself in a situation where its old equipment was no longer functioning adequately and there were no funds for replacement. It might also be generally said that under L. 1953, c. 655, § 2, where the commission might determine to acquire new properties for the purpose of expanding or extending the scope of its operations, such purpose may be financed by revenue

anticipation certificates. While this generalization may not be relied upon to answer every financial problem which may face the utility, we think it fairly expresses a reasonable guide for us to follow in considering the facts in this case.

█ From the record it appears that at the present time the municipal power plant contains four turbine-generator units, with rated capacities of 5,000 kilowatts, 2,500 kilowatts, and two of 1,500 kilowatts each. The proposed new 7,500-kilowatt unit will be put in the place of one of the 1,500-kilowatt units, which will be eliminated. In addition to having at least 5 times the capacity of the 1,500-kilowatt unit, the new unit is considerably more substantial in all other respects, including physical size, shipping weight, steam extracting capacity, and operating pressures and temperatures. The unit being replaced, being the oldest in the plant, has been used chiefly as a standby unit in recent years, producing less than 1 percent of the system's power. The new unit, on the other hand, will produce 97 percent of the system's power. It will produce all the system's power 85 percent of the time, the three remaining older units being used as standbys, until such time as increased demand shall require their use again. The increased capacity is necessitated by an increase in demand within the area presently served by the commission's facilities, and not by an increase in the area or population to be served.

We agree with the trial court that the new unit may be properly considered as a replacement rather than an extension or expansion of the utility as plaintiffs contend. The few authorities defining the word replacement in anything like the present context are of limited assistance to us because these definitions cannot be properly considered in isolation from the diverse policies of the various statutes and contracts involved. See, City of Los Angeles v. County of Mono, 51 Cal. (2d) 843, 337 P. (2d) 465; Shrader v. Commercial Coal Min. Co. 260 Pa. 576, 104 A. 151; Colonial Theatrical Enterprises v. Cohen, 258 Mich. 407, 242 N. W. 770; Illinois Cent. R. Co. v. Franklin County, 387 Ill. 301, 56 N. E. (2d) 775.

Of these authorities, we find the City of Los Angeles case, which was relied upon by the trial court, the most persuasive. In that case

three municipal power plants generating a total of 112,500 kilowatts were substituted for two old plants, generating a total of 7,400. Two of the new plants were located in the County of Mono, outside the city limits of Los Angeles. The county sought to tax the new plants under a statute allowing counties near large cities to tax city-owned improvements which are replacements for those in existence but not new improvements. The court held that the three new plants were replacements for the two old ones on the ground that the new plants served the same function, even if on a broader scale, than the old ones. The court said (51 Cal. [2d] 849, 337 P. [2d] 469):

"In this case the new facilities are substantially the same improvements as the [old] plants. The greater capacity, more elaborate and efficient operation, and the greater value of the [new system] do not serve to differentiate it in character from the [old] plants. Electric power is still generated, but on a much broader and more efficient scale."

The value of this decision is somewhat limited in our case because of the great weight given by the California court to the particular statutory policy involved, mainly protecting the tax base of the counties. See, City and County of San Francisco v. San Mateo County, 17 Cal. (2d) 814, 112 P. (2d) 595; City of Pasadena v. Los Angeles County, 37 Cal. (2d) 129, 230 P. (2d) 801. However, we feel that the analysis of the meaning of replacement is nonetheless cogent.

Here it seems to us that the new unit may reasonably be held to be a replacement. It effectively replaces not just the one 1,500-kilowatt unit being eliminated, but all the units, three old units remaining as standbys. It is true that the capacity of the plant is increased, but the essential purpose of replacement is also served; the function of the old, possibly obsolete, units is taken over by the new one. The need for a reserve to replace the old, worn-out equipment is reduced as the equipment will now be mostly new. There is no expansion in the operation of the utility in the sense that new services are to be provided for new markets or that a new area is to be served. The fact that the replacement serves the users better than did the old equipment does not change its character.

It is next asserted that the trial court erred in refusing to permit an amendment to the complaint. This case comes to us on the original files of the district court without a printed record. We do not find in the file a copy of the proposed amended complaint. We gather from plaintiffs' brief, however, that in February 1964 an audit was made of the books of the commission which disclosed "itemized disbursements clearly improper under the statute." They thereupon moved to amend the complaint to allege a second cause of action "reciting such disbursements and praying for an order restoring the Reserve for Replacement Fund to such a level as the Court would determine proper." The trial court was apparently of the view that the proposed amended complaint introduced a new and different cause of action involving innumerable transactions over a 10-year period.

In view of the record before us, we cannot say that there was an abuse of the court's discretion in not allowing the amended complaint. Amendment of pleadings is governed by Rule 15.01, Rules of Civil Procedure. Ordinarily, amendments should be freely granted, except where to do so would result in prejudice to the other party. Here it is apparent that the trial court was of the view that the delay which might follow from extended litigation involving a new cause of action would be prejudicial to the interests of the municipal commission.

In Dale v. Pushor, 246 Minn. 254, 262, 75 N. W. (2d) 595, 601, we said:

"* * * Despite the need for liberality, it is not to be overlooked that the granting or denial of a motion for an amendment to the pleadings is a matter lying in the sound discretion of the trial court and its action will not be reversed except for a clear abuse of discretion."

We cannot agree that the trial court abused its discretion. It was important in this case for the commission to have its rights determined promptly so that the utility could be efficiently maintained. It was not necessary that that issue be encumbered by an extended dispute over the propriety of expenditures made during the past 10 years. If there was any doubt as to the legality of these expenditures and the right

to demand restoration, such an action should have been started long prior to this. In any event, there is nothing to prevent plaintiffs to proceed at any time by an independent action.

Affirmed.