Milton LaPANTA, et al., Respondents,

v.

Cecil HEIDELBERGER and Patricia A.
Heidelberger, Appellants.

No. CX–86–147.

Court of Appeals of Minnesota.

Aug. 12, 1986.

Richard J. Sundberg, Minneapolis, for respondents.

Elam Baer, Harstad & Rainbow, Minneapolis, for appellants.

Heard, considered and decided by PARKER, P.J., and WOZNIAK and SEDGWICK, JJ.

## OPINION

PARKER, Judge.

This dispute arises out of a contract for the sale of Minnesota Tire Recycling, Inc. (MTR), a corporation engaged in the business of stockpiling and shredding used rubber tires. Respondent Milton LaPanta brought this action on his own behalf and on behalf of MTR, seeking specific performance of an earnest money agreement he had entered into with the shareholders of MTR, Robert Sayers and appellants Cecil and Patricia Heidelberger. The Heidelbergers commenced a separate action seeking cancellation of the earnest money agreement, alleging LaPanta was insolvent and unable to close the transaction. The Heidelbergers' complaint was subsequently ruled to be a compulsory counterclaim, and the two actions were consolidated. A five-day trial was held in October 1985.

Based on the evidence submitted, the trial court ordered that the Heidelbergers execute a lease to LaPanta, sign a covenant not to compete, sell their stock in MTR to LaPanta, and sell their tires to LaPanta for $270,000. The Heidelbergers appeal from the judgment entered, contending specific performance was inappropriate because LaPanta is insolvent, because there is no valid contract, and because LaPanta made fraudulent misrepresentations to them. Respondents have also filed a notice of review challenging several of the trial court's findings. We affirm in part, reverse in part and remand for additional findings.

## FACTS

In 1953 Cecil Heidelberger began accumulating used tires and other miscellaneous junk on land owned by him and his wife, Patricia Heidelberger, and located in the City of Andover in Anoka County.

In 1983 Schriptek Recovery Systems International, Inc., and its president, Ray J. Slaback, contracted to purchase and process Heidelbergers' tires. Schriptek installed a tire shredding machine on the property and sold the tire shreds for use as a fuel additive. In October 1984 another company owned by Slaback, North American Tire Tech, Inc. (NATT), turned the operation over to the Heidelbergers and granted them an option to purchase the machine for $400,000.

In December 1984 the Heidelbergers and Sayers, the general manager of the tire shredding operation, entered into a shareholders' agreement and incorporated as MTR. Sayers testified that he contacted a number of banks and other possible investors in an attempt to raise money so that MTR could exercise its option to purchase the shredder. LaPanta, a real estate broker, eventually expressed an interest in purchasing the corporation.

At this point, the facts become controverted. The Heidelbergers allege that LaPanta made several fraudulent misrepresentations to them during contract negotiations. They claim that LaPanta informed them he was buying for a group of wealthy

investors. The Heidelbergers did not demand a financial statement because LaPanta told them these investors would be insulted and wished to remain secret; they did not require a security interest because LaPanta told them the investors demanded complete control of MTR. The Heidelbergers also contend LaPanta failed to disclose that a series of judgments were pending against him and that he had declared bankruptcy in 1978.

Sayers' testimony disagreed with that of the Heidelbergers; he testified at trial that he was fully aware LaPanta had no outside or secret investors. Sayers admitted that he and the Heidelbergers were "pretty desperate" to obtain financing because they would soon lose the entire operation. A letter from NATT's attorney confirmed this desperation: if the Heidelbergers had failed to come up with money to purchase the tire shredder by April 12, 1985, they would have had to "cease all waste tire processing operations."

LaPanta's testimony is consistent with that of Sayers. LaPanta denied ever representing that he was purchasing on behalf of secret investors. He testified he had disclosed to the Heidelbergers that he had tax liens and judgments pending against him. He admitted that at about the same time the purchase agreement was entered, he also entered into a contract with NATT to purchase the shredder.

After lengthy negotiations, several drafts prepared by both parties, consultation with attorneys, and numerous handwritten changes, an earnest money agreement was signed on April 26, 1985. Under its terms, LaPanta assumed management control of the operation immediately. Although they were to close within 30 days, the parties disagreed on a number of items, including the extent of the corporate liabilities. Sayers has since closed the sale of his minority shares with LaPanta and remains in MTR's employ.

## ISSUES

1. Did the trial court abuse its discretion in ordering specific performance?

2. Did the trial court clearly err in awarding certain corporate assets to the Heidelbergers?

3. Did the trial court clearly err in finding that the corporate liabilities did not exceed $45,000?

## DISCUSSION

### I

■ Specific performance is an equitable remedy addressed to the sound discretion of the trial court. Accordingly, this court will not interfere on appeal unless the trial court clearly abused its discretion. *Flynn v. Sawyer*, 272 N.W.2d 904, 910 (1978) (citations omitted).

■ The Heidelbergers contend that specific performance was inappropriate and that the trial court should have cancelled the contract because of the fraudulent misrepresentations made by LaPanta during the contract negotiations. Fraud was not pled by the Heidelbergers as a defense or as a claim, and the trial court made no findings on any such issue. On appeal, this case must be considered in accordance with the theory on which it was pled and tried; a party cannot, for the first time on appeal, shift its position. *Security Bank of Pine Island v. Holst*, 298 Minn. 563, 215 N.W.2d 61 (1974).

The Heidelbergers insist that fraud was properly raised and litigated. They assert that during a pretrial hearing in July 1985 LaPanta was put on notice that the trial would focus on their allegations of fraud. At no time during this hearing, however, did the Heidelbergers ever expressly accuse LaPanta of fraud or state that fraud would be an issue at trial. The first time the Heidelbergers made express allegations of fraud was three days before trial in a letter and statement of the case addressed to the trial court.

■ Prior to commencement of trial, LaPanta moved to limit the evidence to the issues raised in the pleadings; he specifically requested that no evidence be admitted on the issue of fraud because it was not pled. The Heidelbergers made no objection to this motion, and it was granted. Indeed, the Heidelbergers did not move to amend the pleadings to include their claim of fraud until after LaPanta's cross-examination had begun. The trial court's denial of the motion was well within its discretion, since trial had already begun and the defendant might have been prejudiced. Minn.R.Civ.P. 15.01; *Hughes v. Micka*, 269 Minn. 268, 130 N.W.2d 505 (1964); *LOL Finance Co. v. Romain Corp.*, 352 N.W.2d 841 (Minn.Ct.App.1984).

■ By sheer persistence on the part of the Heidelbergers' attorney, some testimony of fraud was admitted during trial. LaPanta continually objected to admission of this testimony and stated he would not litigate the issue of fraud by consent. *See* Minn.R.Civ.P. 15.02. Because fraud must be pled with particularity and because LaPanta clearly did not consent to litigate the issue, it cannot now be considered on appeal.

■ The Heidelbergers also contend specific performance was inappropriate because LaPanta is insolvent, as evidenced by the various judgments pending against him and by his declaration of bankruptcy in 1978. In order to obtain specific performance, a party must be able and willing to perform. *See Rooney v. Dayton-Hudson Corp.*, 246 N.W.2d 170, 176 (1976) (specific performance should not be granted where offeree had no funds available and merely had loan commitment).

■ During this litigation, the issue of the buyer's purported insolvency was considered by two different trial judges. Although there was no showing of insolvency in a formal sense, each of these judges required that LaPanta demonstrate his ability to perform under the contract: at a hearing in July 1985 to determine whether the closing should continue, LaPanta was required to deposit an $18,116.86 cashier's check with the clerk of court as the downpayment due at closing; upon conclusion of trial, LaPanta was ordered to produce $43,-458.18, the balance due under the contract.

In both instances LaPanta met the conditions imposed. Under these circumstances, it was not an abuse of discretion to conclude that LaPanta had the ability to perform under the terms of the contract.

■ The Heidelbergers insist that various post-judgment activities of LaPanta establish that he is unable to perform. This evidence is not properly part of the record before this court. Should it later appear that LaPanta is unable to perform according to the terms of the contract, the trial court retains continuing jurisdiction for the purpose of enforcing its decree. *Henschke v. Young,* 224 Minn. 339, 28 N.W.2d 766 (1947).

■ The Heidelbergers contend there was no "meeting of the minds on terms essential to the formation of the contract." In order for a contract to be specifically enforced, it is not necessary that the parties agree on every possible point; rather, the law merely requires that the parties' intent as to the fundamental terms of the contract can be ascertained with reasonable certainty. *Hill v. Okay Construction Co., Inc.,* 252 N.W.2d 107, 114 (Minn.1977). Here, the written contract contains all of the fundamental terms of the transaction, including the parties' names, price, time and manner of payment, and a description of the property. LaPanta, Sayers, and Cecil Heidelberger testified that the contract represented the parties' intent and contained all terms negotiated. We conclude that the trial court did not err in ordering specific performance of this contract.

## II

LaPanta cross-appeals several findings made by the trial court. When a party appeals from a judgment without making post-trial motions, our scope of review is limited:

> Findings of fact made by a trial court sitting without a jury will not be set aside unless they are clearly erroneous, with due regard for the opportunity of the trial court to judge the credibility of the witnesses. Minn.R.Civ.P. 52.01. It has been held that when the lower court is the trier of fact, its findings on disputed questions are entitled to the same weight as a jury verdict and will not be upset merely because a reviewing court may view the evidence differently. *See State v. Simonsen,* 252 Minn. 315, 324, 89 N.W.2d 910, 916 (1958). The findings must be manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole. *N.S.P. v. Lyon Food Products, Inc.,* 304 Minn. 196, 201, 229 N.W.2d 521, 524 (1975).

*Tonka Tours, Inc. v. Chadima,* 372 N.W.2d 723, 726 (Minn.1985).

LaPanta argues that the trial court clearly erred in awarding certain corporate assets to the Heidelbergers, particularly the accounts receivable as of April 26, 1985. The agreement itself makes no reference to the accounts receivable; a prior draft prepared by Pat Heidelberger had included language indicating the accounts receivable were to be awarded to the Heidelbergers. LaPanta refused to agree to this language, and the final agreement excluded it.

Pat Heidelberger testified that she did not think a provision on the accounts receivable needed to be included in the contract because it was "our understanding." She testified that LaPanta made a side agreement with them to that effect because the investors would not accept such a provision in the written document. Other witnesses also testified that the Heidelbergers were to receive the accounts receivable prior to April 26, including Cecil Heidelberger and Maurice Harpster, MTR's office manager and secretary. Following the signing of the contract, separate statements were sent out by LaPanta and by the Heidelbergers, in effect specifying that bills prior to April 26 were to be paid to the Heidelbergers and that those after April 26 were owed to MTR.

■ Although the parol evidence rule excludes evidence of contemporaneous and prior agreements varying the terms of a written contract, it does not exclude evidence of subsequent oral modifications of a

contract. *Flynn,* 272 N.W.2d at 907. The parties' subsequent conduct in sending out separate bills supports the trial court's finding that the accounts receivable as of April 26 were to be retained by the Heidelbergers.

LaPanta next contests the trial court's finding that wheel rims removed from tires were to be the property of the Heidelbergers. The contract provides that the Heidelbergers were to sell "their entire supply of used tires." Various witnesses testified that the term "tires" does not include the metal wheel rims and that these rimmed tires are randomly interspersed throughout the tire pile.

■ LaPanta and Sayers testified that it was their understanding that the Heidelbergers were selling the entire pile, including all tires and related items. Cecil Heidelberger testified that under the contract he did not sell the metal rims to LaPanta. He also testified that Slaback, who had run the operation from 1983 to 1984, never crushed the rims but just stacked all the rimmed tires in a separate pile. The trial court considered this evidence, not in an attempt to vary the terms of the contract, but in an attempt to ascertain what the parties meant by the term "tires." Its finding awarding the metal rims removed from the tires to the Heidelbergers is not clearly erroneous and must be upheld.

LaPanta contends the trial court erred in awarding to the Heidelbergers the value of one-half of the tires that had been removed from an easement adjacent to the leased premises. The contract provides that LaPanta purchased tires located on the "above premises," referring to the leased premises; it fails to mention those tires located on various road easements retained by the Heidelbergers. LaPanta assumed he had purchased the tires on the easement. Cecil Heidelberger testified the sale did not include those tires and that he wanted them for a "special project."

LaPanta had apparently removed tires from the easement about three weeks before the trial. Estimates of the number of tires removed and shredded ranged from LaPanta's estimate of 25,000 to 50,000, Sayer's estimate of 50,000 to 60,000, and Cecil Heidelberger's estimate of 150,000. Sayers, however, indicated that only tires without wheel rims were taken from the easement.

■ The trial court awarded the Heidelbergers $1,875, half the value of the tires that it found to have been removed. This finding is clearly erroneous; no one testified that one-half of these easement tires were to be excluded from the sale, and there is no discernible evidence establishing that this portion of the tires removed had a value of $1,875. LaPanta convincingly argues that because, under the terms of the contract, the Heidelbergers were required to execute a covenant not to compete, they no longer had any use for the tires piled on the easement. We agree and conclude that, under the terms of the contract, the Heidelbergers intended to sell their entire supply of used tires to LaPanta, including those tires on the easement. The trial court's finding awarding the Heidelbergers one-half the value of the easement tires is therefore reversed.

### III

■ Finally, LaPanta challenges the trial court's finding regarding the extent of the corporate liabilities as of April 26. The contract provided that if these corporate liabilities exceeded $45,000, the Heidelbergers would pay the excess. Although the trial court found that the liabilities did not exceed $45,000, the evidence fails to support such a conclusion.

Pat Heidelberger had prepared a list of the accounts payable in anticipation of the closing and admitted that this list totalled $52,357.59. She further testified:

> When we had discussed the amount of payables that we owed, he [LaPanta] knew that the payroll taxes had not been paid and he also knew that we had quite a few other liabilities. That's why the amount of $45,000 was filled out because that's what we figured we owed right about that time, and subsequent—until

we added up each individual one and digging out all the bills, *we found out it was a little bit over that.*

(Emphasis added). The corporate liabilities clearly exceeded $45,000 by at least $7,357.59. From the record, however, it is impossible to ascertain the extent of those liabilities.

Because the trial court's finding appears contrary to the evidence, this issue must be remanded for additional findings and the taking of additional testimony if necessary. The record in this case is confusing and difficult. On remand, therefore, we suggest that the trial court appoint an accountant or other expert to examine the records, determine the extent of the corporate liabilities as of April 26, and report directly to the court. The costs of such an audit should be assessed to the parties.

### DECISION

Affirmed in part, reversed in part and remanded.