**BRIDGEWATER TELEPHONE COMPANY, INC.,**
Appellant,

v.

**CITY OF MONTICELLO, Respondent.**

No. A08–1928.

Court of Appeals of Minnesota.

June 2, 2009.

Robert Hochman (pro hac vice), Sidley Austin LLP, Chicago, IL, and Patrick M. O'Donnell, Smith Paulson O'Donnell and Associates, PLC, Monticello, MN, and Gregory R. Merz, Gray Plant Mooty Mooty & Bennett, P.A., Minneapolis, MN, for appellant.

John M. Baker, Pamela L. VanderWiel, Kathryn N. Hibbard, Greene Espel, P.L.L.P., Minneapolis, MN, for respondent.

Lani L. Williams, (pro hac vice), Local Government Lawyer's Roundtable, Inc., Oconomowoc, WI, for amicus curiae National Association of Telecommunications Officers and Advisors.

Considered and decided by CONNOLLY, Presiding Judge; HUDSON, Judge; and WORKE, Judge.

## OPINION

CONNOLLY, Judge.

Appellant argues that the district court erred in its interpretation of Minn.Stat. § 475.52, subd. 1 and abused its discretion by failing to allow appellant to twice amend its complaint. Because the district court did not err in its conclusion that a broadband-communication network qualified as a "utility or other public convenience," the operating reserve fund was to be used for start-up costs, not current expenses, and the district court did not

abuse its discretion in denying appellant's motions to amend its complaint, we affirm.

## FACTS

The facts in this case are largely undisputed. Appellant Bridgewater Telephone Company provides telephone, telecommunications, video, and Internet service in and around Monticello. On May 5, 2008, respondent City of Monticello issued a preliminary offering statement regarding the proposed issuance of $25,680,000 in revenue bonds to fund the installation of a fiber-to-the-premises network (the Fiber Project). The Fiber Project is a broadband-communications network that would provide telephone, Internet services, and cable television services to the service territory of the City of Monticello. The bonds were executed and delivered pursuant to Minn.Stat. §§ 475.51 to 475.80 (2008). Per a three-year management agreement, Hiawatha Broadband Communications Inc. was to operate and manage the Fiber Project on a day-to-day basis. According to the preliminary offering statement, the revenue bond proceeds are to be parceled into various funds, including $1,250,000 to be placed in an "Operating Reserve Fund."

On May 21, 2008, Bridgewater filed a complaint alleging that the revenue bonds Monticello intended to issue for the Fiber Project were not authorized under Minn. Stat. § 475.52, subd. 1. Monticello answered and moved to require Bridgewater to post a surety bond and to dismiss Bridgewater's complaint. Following a hearing on the matter, the district court ordered Bridgewater to post a $2.5 million surety bond. Bridgewater did so.

On June 1, 2008, Monticello entered into an indenture of trust, in which the city agreed to place the bonds and their proceeds into escrow until this litigation is concluded. On June 20, Monticello filed an amended motion to dismiss the complaint under Minn. R. Civ. P. 12.02(e). A hearing was held on that motion on July 18, and the district court took the matter under advisement. Four days before the hearing, Bridgewater sought leave to file its first amended complaint, seeking to add factual allegations regarding new information and documents that it had received through discovery and requests under the Minnesota Government Data Practices Act.

On July 28, Monticello announced that it would proceed with a subset of the Fiber Project, in which an 11.19–mile stretch of fiber would be installed to provide high-speed Internet, but not telephone or cable (the Fiber Loop). This construction was to be financed with existing reserves, rather than out of the inaccessible bond-revenue proceeds. Based on the Fiber Loop announcement, Bridgewater moved for leave to file its second amended complaint. This complaint added a new count alleging that Monticello's use of existing reserves to construct the Fiber Loop would be an unlawful expenditure of public funds and would violate Monticello's cable franchise ordinance. In August, hearings were held on both motions for leave to file amended complaints.

On October 8, the district court issued an order granting Monticello's motion to dismiss for failure to state a claim on which relief could be granted. Shortly thereafter, the district court denied both of Bridgewater's motions for leave to file amended complaints. This appeal follows.

## ISSUES

I. Did the district court err by granting Monticello's motion to dismiss?

II. Did the district court abuse its discretion by refusing to allow Bridgewater to amend its complaint?

## ANALYSIS

### I. The district court did not err by granting Monticello's motion to dismiss.

Bridgewater argues that the district court erred by granting Monticello's motion to dismiss. The district court concluded that Monticello's issuance of the bonds complied with the directives set forth in Minn.Stat. § 475.52, subd. 1 and, therefore, Bridgewater's complaint failed to state a claim on which relief could be granted.

"When reviewing a case dismissed pursuant to Minn. R. Civ. P. 12.02(e) for failure to state a claim on which relief can be granted, the question before this court is whether the complaint sets forth a legally sufficient claim for relief." *Hebert v. City of Fifty Lakes,* 744 N.W.2d 226, 229 (Minn. 2008) (citing *Barton v. Moore,* 558 N.W.2d 746, 749 (Minn.1997)). In determining whether a complaint fails to state a claim upon which relief can be granted the court considers only the facts alleged in the complaint, accepting those facts as true, and construes all reasonable inferences in favor of the nonmoving party. *Id.* The court may consider documents referenced in a complaint without converting a motion to dismiss to one for summary judgment. *N. States Power Co. v. Minn. Metro. Council,* 684 N.W.2d 485, 490 (Minn.2004).

 " '[M]unicipalities have no inherent powers and possess only such powers as are expressly conferred by statute or implied as necessary in aid of those powers which have been expressly conferred.' " *State v. Kuhlman,* 729 N.W.2d 577, 580 (Minn.2007) (quoting *Mangold Midwest Co. v. Village of Richfield,* 274 Minn. 347, 357, 143 N.W.2d 813, 820 (Minn.1966)). Therefore, Monticello's authority to issue revenue bonds must be conferred by stat-

ute. Minn.Stat. § 475.52, subd. 1 provides:

> Any statutory city may issue bonds or other obligations for the acquisition or betterment of public buildings, means of garbage disposal, hospitals, nursing homes, homes for the aged, schools, libraries, museums, art galleries, parks, playgrounds, stadia, sewers, sewage disposal plants, subways, streets, sidewalks, warning systems; *for any utility or other public convenience from which a revenue is or may be derived;* for a permanent improvement revolving fund; for changing, controlling or bridging streams and other waterways; for the acquisition and betterment of bridges and roads within two miles of the corporate limits; for the acquisition of development rights in the form of conservation easements under chapter 84C; and for acquisition of equipment for snow removal, street construction and maintenance, or fire fighting. *Without limitation by the foregoing the city may issue bonds to provide money for any authorized corporate purpose except current expenses.*

(Emphasis added.)

Bridgewater's statutory claims focus on two provisions in Minn.Stat. § 475.52, subd. 1. First, Bridgewater contends that Monticello did not have the statutory authority to issue the bonds because the Fiber Project is not a "utility or other public convenience from which a revenue is or may be derived." Minn.Stat. § 475.52, subd. 1. Second, Bridgewater asserts that Monticello intends to improperly apply the bond proceeds to pay current expenses, which is explicitly prohibited by the statute. Interpretation of these statutory provisions is an issue of first impression in Minnesota.

"The fundamental rule of statutory construction is that a court should look first to

the specific statutory language and be guided by its natural and most obvious meaning." *Heaslip v. Freeman*, 511 N.W.2d 21, 22 (Minn.App.1994), *review denied* (Minn. Feb. 24, 1994). Only if the statute is ambiguous or unclear does the court apply rules of statutory construction. *Correll v. Distinctive Dental Servs., P.A.*, 607 N.W.2d 440, 445 (Minn.2000). "Under the basic canons of statutory construction, we are to construe words and phrases according to rules of grammar and according to their most natural and obvious usage unless it would be inconsistent with the manifest intent of the legislature." *ILHC of Eagan, LLC v. County of Dakota*, 693 N.W.2d 412, 419 (Minn.2005). A statute should be interpreted to give effect to all of its provisions. *Amaral v. Saint Cloud Hosp.*, 598 N.W.2d 379, 384 (Minn. 1999). "Whenever it is possible, no word, phrase, or sentence should be deemed superfluous, void, or insignificant." *Id.*

A. *"Utility or other public convenience from which a revenue is or may be derived" encompasses the creation of a broadband-communication network.*

Bridgewater argues that both Monticello's and the district court's interpretations of the "utility or other public convenience" clause are too broad. Bridgewater asserts that "other public convenience" is limited only to building utility-like projects and a broadband-communication network is not a utility-like project. The district court rejected this argument.

Bridgewater's interpretation of this clause is too narrow. Bridgewater argues that the only way to give meaning to the word "other" is to limit "public convenience" to something like a utility. The problem with this interpretation, as the district court noted, is that "to interpret 'other public convenience' to mean utility would be to assume the statutory phrase 'other public convenience' is superfluous, which this [c]ourt cannot do." Furthermore, "other" seems to merely imply that utilities are a type of public convenience. Therefore, while all utilities are indeed public conveniences, it does not follow that all public conveniences must necessarily be utilities.

The district court further construed the word "or," stating: "The word 'or' as used in 'for any utility or other public convenience' is a coordinating conjunction which links ideas of equal importance. Grammatically speaking, the phrase 'or other public convenience' is not necessarily limited to meaning 'utility' per se, but a service of equal importance." We agree. This court must now determine whether the district court erred when it held that the Fiber Project qualifies as a public convenience.

Monticello interprets "public" and "convenience" separately and then combines their definitions, thereby concluding that "public convenience" refers to something that is available to the general public that is also conducive to comfort or ease. Monticello concedes that this definition is very broad. The district court determined that this definition was too broad because it would arguably give the city the authority to issue bonds for limitless purposes, including funding a gas station or hair salon. The district court concluded that Monticello and Bridgewater were each interpreting this clause in an extreme fashion and that the legislature intended a definition somewhere in between. The district court then concluded that this project qualifies as a "public convenience," without clearly articulating the definition of that term.

Minnesota courts have not defined the term "public convenience" in the context of this statute. Other jurisdictions appear to have done so, but not in the context of

bond revenue.[1] The most obvious usage of public convenience seems to be "something ... conducive to comfort or ease" that affects all members of a community. *Merriam–Webster Dictionary* 252 (10th ed.2001). This broad definition, however, is arguably inconsistent with the manifest intent of the legislature to be more limiting. Minn.Stat. § 475.52 (2008) specifically articulates the situations in which revenue bonds may be issued. As stated by the district court, "[t]hese enumerated purposes elucidate the intent to permit cities to issue bonds to make a city a better place for its citizens to live." But this statute should not be read to give cities unlimited power to conduct any private business that arguably would be convenient to the public. The legislature undoubtedly articulated specific purposes to prevent such a significant grant of power. Therefore, the district court was correct in its determination that the definition of public convenience falls somewhere between Bridgewater's narrow definition and Monticello's broad characterization. The Fiber Project falls within those parameters as well.

The legislature has granted municipalities the express authority to own and operate telephone exchanges within their borders, as well as to operate public-cable communications systems. Minn.Stat. §§ 237.19, 238.08, subd. 3 (2008). Municipalities are not granted a similar authorization with regard to Internet service; however, the legislature has stated that it is a goal to "encourage[e] economically efficient deployment of infrastructure for higher speed telecommunication services and greater capacity for voice, video, and data transmission." Minn.Stat. § 237.011 (2008). Therefore, based on a plain and obvious interpretation of the term "public convenience" and the general intent of the legislature to promote telecommunications, the district court did not err in dismissing the action for failure to state a claim.

Regardless, even if this court were to accept Bridgewater's reading of the statute, the Fiber Project arguably qualifies as a utility or utility-like project. A Minnesota statute generally restricting the ability of Minnesota municipalities to issue bonds for projects outside of their jurisdiction provides an exception for bonds issued to finance property for "municipal public utilities." Minn.Stat. § 471.656 (2008). That same statute defines "municipal public utilities" as "the provision by a municipality of electricity, natural gas, water, wastewater removal and treatment, telecommunications, district heating, or cable television and related services." Minn.Stat. § 471.656, subd. 3(c). Bridgewater concedes that telephone services are utilities and that television services are a gray area, but steadfastly denies that Internet services qualify as a utility. Therefore, according to Bridgewater, the project in its

1. Black's Law Dictionary previously referred to a public convenience as that which is fitting or suited to the public need. *Black's Law Dictionary* 1228 (6th ed.1990). Other jurisdictions have defined the term as well. The Rhode Island Supreme Court has referenced the term public convenience as "something fitting or suited to the public need." *Abbott v. Pub. Utils. Comm'n*, 48 R.I. 196, 136 A. 490, 491 (1927). The California Court of Appeals defined public convenience as a "public matter, without which the public is inconvenienced to the extent of being handicapped in the practice of business or wholesome pleasure or both, and without which the people of the community are denied, to their detriment, that which is enjoyed by others similarly situated." *Luxor Cab Co. v. Cahill*, 21 Cal.App.3d 551, 98 Cal.Rptr. 576, 580 (1971). As Bridgewater points out, these definitions relate to findings of public convenience or necessity in the context of determinations by public utilities commissions and similar governmental boards that certain actions could or could not be taken.

entirety lacks statutory authority to be funded by revenue bonds because Monticello intends to provide Internet service. Based on the aforementioned statute, there appears to be minimal dispute that telephone and cable television are utilities. The crux of the issue is whether broadband Internet service is like a utility.

The definition of municipal public utilities appears broad enough to contemplate Internet service. Internet service could arguably be considered a utility under "telecommunications" or "related services." Bridgewater argues that "related services" means services related to providing cable television, such as on-demand movies. However, cable-television companies often provide Internet services. Therefore, on-demand movies, digital video recorders, and Internet service could also be considered "related services" under the statute. Furthermore, Merriam Webster dictionary defines telecommunication as "communication at a distance (as by telephone)." *Merriam Webster Dictionary* 1207 (10th ed.2001). Internet service seems to meet this definition. E-mail, instant messaging, and talking via web-cam are all ways to communicate at a distance utilizing Internet service. Based on the foregoing definition, the Fiber Project is arguably a utility.

Bridgewater argues that Internet service cannot be considered a utility because it does not have the "near universal usage common to a utility." This argument is flawed. As noted by Monticello, "[i]t would be absurd to conclude that the Minnesota Legislature [would allow revenue bonds] to be used only to fund the creation of systems that provide services that already are in universal or near-universal use." Rather, it seems that the reasoning behind allowing municipalities to issue these bonds is to provide utility-like services to people who otherwise would not be able to enjoy the benefits of the services offered. It is illogical to conclude that something is or is not a utility based on the number of people who have access to it.

■ Lastly, Bridgewater argues that the issuance of the revenue bonds is not contemplated by the statute because this project is not "public." Bridgewater contends that the Fiber Project is not public because it does not "serve as a benefit to the community as a body" and is not "directly related to the functions of government." *See Borgelt v. City of Minneapolis,* 271 Minn. 249, 255, 135 N.W.2d 438, 443 (1965) (quotation omitted). Bridgewater further asserts that when the "utility or other public convenience" language was added to the statute in 1949, the legislature could not have contemplated such an expansive invasion of government into private business. Bridgewater provides no support for this assertion. In fact, the plain language of the statute seems to contemplate just such a governmental foray into private business, when it states "for which a revenue is or may be derived." The fact that revenue could be derived seems to contemplate government entering into the private sector, where competition is likely to exist. This language also demonstrates that the legislature did not mean to limit "any utility or other public convenience" to things made available to the community for free.

Furthermore, the *Borgelt* language quoted above relates to the public-purpose doctrine. It states that "[a]n essential consideration in determining whether the city has the authority to engage in the activity which plaintiffs seek to restrain is whether the city's money is being spent for a public purpose." *Id.* That seems to be a different question than that which we are attempting to answer here: What does "public" mean in the context of a "public

convenience?" The Fiber Project will be accessible to all residents for a fee, just like water, telephone, electricity, and natural gas. This, under the plain language of the statute, is sufficient to make the service public.

In addition, the definition of "public purpose" has expanded in the 30 years following the *Borgelt* decision. Thirteen years after *Borgelt*, the Minnesota Supreme Court stated that "[b]ecause 'public purpose' is an elusive concept, whether a particular expenditure serves a public purpose requires case-by-case disposition. · We have also recognized that 'public purpose' should be broadly construed to comport with the changing conditions of modern life." *R.E. Short Co. v. City of Minneapolis*, 269 N.W.2d 331, 337 (Minn.1978). Providing an entire community of people with access to telephone services, cable television, and high-speed Internet seems to qualify as a benefit to the public under the changing conditions of modern life. Thus, the Fiber Project is a public convenience that also serves a public purpose.

■ Bridgewater argues that because Hiawatha will be operating the project and will benefit from it, the Fiber Project is not public. Hiawatha's benefit does not negate Monticello's authority to implement the project. *See City of Pipestone v. Madsen*, 287 Minn. 357, 373, 178 N.W.2d 594, 603 (1970) ("It is beyond question that Pawnee Corporation will receive a large benefit from this program; however, this fact alone should not invalidate the project.").

*B. Start-up costs are not current expenses.*

Bridgewater argues that because a portion of the revenue raised from the bond sales will be placed in an operating reserve fund and used to pay some current expenses associated with the project,[2] issuance of the bonds violates Minn.Stat. § 475.52, subd. 1. The district court determined that the current-expenses prohibition does not apply to bonds issued pursuant to the "utility or other public convenience" clause. The district court further concluded that the expenses contemplated by Bridgewater were actually start-up costs, and not current expenses, and therefore did not violate the statute under any interpretation.

■ The district court concluded, and Monticello agrees, that Minn.Stat. § 475.52, subd. 1 allows for the bonds to be used to pay current expenses. The last sentence of the statute provides: "Without limitation by the foregoing the city may issue bonds to provide money for any authorized corporate purpose except current expenses." Minn.Stat. § 475.52, subd. 1. According to Monticello, under a plain reading of this sentence, it appears that only revenue obtained pursuant to any corporate purpose is prohibited from being applied to current expenses. As the district court stated: "The last clause of the second sentence only limits the first clause of the second sentence." We disagree.

This court finds Bridgewater's reading of the statute more convincing. The statute should be read so as to give effect to all provisions. *Am. Family Ins. Group v. Schroedl*, 616 N.W.2d 273, 277 (Minn.2000). The second sentence begins with the language "[w]ithout limitation by the foregoing." This language explains that the catchall provision in the second sentence is not limited by the prior delineation of specific proper uses. The second sentence goes on to state that "the city may issue

---

**2.** Black's Law Dictionary defines current expenses as "[a]n expense incurred in running a business and producing output." *Black's Law Dictionary* 618 (8th ed.2004).

bonds to provide money for any authorized corporate purpose *except current expenses.*" (Emphasis Added.) A plain reading of this sentence indicates that the bonds may be issued for any corporate purpose, without limitation by the specific grants of power from the first sentence; however, in no event shall any bond money be used to pay current expenses. Therefore, under this plain reading of the statute, Monticello would be overstepping its boundaries if it were to use bond money to pay current expenses.

Monticello argues that the operating reserve fund is being used to fund start-up costs, which are necessarily incurred until the project begins to generate baseline income, not current expenses. We agree. The district court relied on the fact that the operating reserve fund would only exist for three years to support its conclusion that the fund was to be utilized for start-up costs, not current expenses.[3] Furthermore, Monticello is permitted to use funds allocated to the Operating Reserve Fund as an implied power to be used in carrying out an expressly authorized power. *See, e.g., Otter Tail Power Co. v. Village of Wheaton,* 235 Minn. 123, 49 N.W.2d 804, 810 (1951) (finding that "authority so granted must include every essential step in the process by which a building once begun-and however it may have been begun-can be carried to completion where its public use becomes an accomplished fact") (quotation omitted). In the indenture,[4] Monticello clarified how the operating funds would be used.

At any time prior to the occurrence of an Event of Default hereunder amounts on deposit in the Operating Reserve Fund shall be disbursed by the Trustee in accordance with a City Request for: (1) costs of operating and maintaining the Facilities for an initial start-up period, not to exceed the period ended June 1, 2011, or such shorter period ending on the date operating revenues of the Facilities exceed operating costs (exclusive of depreciation and amortization) or (2) nonrecurring costs incurred prior to June 1, 2011, directly associated with the implementation of the Facilities.... Any funds remaining in the Operating Reserve Fund on June 1, 2011, shall be transferred to the Surplus Fund.

Bridgewater argues that the indenture contains proof that Monticello intended to use the bond payments to pay current expenses. The indenture defined operating and maintenance expenses to include "any other current expenses or obligations required to be paid by the city." This is relevant, according to Bridgewater, because the operating reserve fund, according to the preliminary offering statement, shall be used for the payment of operation and maintenance expenses. Nonetheless, Monticello's focus on the three-year start-up period and its clarification that the operating reserve fund will be used to pay "nonrecurring" costs is sufficient for this court to conclude that the bond proceeds were not being inappropriately used to pay current expenses. Moreover, the costs in question, which total $1.25 million, are ap-

---

3. As the district court noted in a footnote, the preliminary offering statement mistakenly noted that the surplus fund would automatically receive any remaining funds from the operating reserve fund "three years after June 1, 2011." The "three years after" language was an error and the parties stipulated as such.

4. The indenture was issued after Bridgewater's original complaint was filed. In its first motion to amend its complaint, Bridgewater argued that the indenture should be considered by the district court. Although the district court denied this motion, Monticello did not "oppose [Bridgewater's] attempt to update the bond documents" and even "urge[d] the Court to review" the indenture.

proximately 4.9% of the total cost of the project, which is $25.68 million. A telecommunications project is inherently different from the building of a park or a museum. Therefore, it is only reasonable to expect that the associated start-up costs will be dissimilar as well. We find nothing in the record to indicate that the money in the operating reserve fund will be used for anything other than start-up costs.[5]

## II. The district court did not abuse its discretion by refusing to allow Bridgewater to amend its complaint.

Bridgewater argues that the district court abused its discretion by refusing to allow it to twice amend its complaint. The district court denied Bridgewater leave to file the first amended complaint because the new factual allegations could not change the fact that Monticello was statutorily authorized to issue the revenue bonds. The district court denied Bridgewater leave to file a second amended complaint because permitting Bridgewater to add an additional claim for relief would have significantly delayed the matter and potentially harmed the public body.

■■■ "The district court has broad discretion to grant or deny leave to amend a complaint, and its ruling will not be reversed absent a clear abuse of that discretion." *State v. Baxter*, 686 N.W.2d 846, 850 (Minn.App.2004) (citing *Fabio v. Bellomo*, 504 N.W.2d 758, 761 (Minn.1993)). It does not appear that the district court abused its discretion in refusing to allow Bridgewater to amend its complaint.

■■■ In the first amended complaint, Bridgewater sought to add additional facts

clarifying that Monticello intended to use the bond revenue to pay current expenses and detailing the involvement of Hiawatha in the Fiber Project. Leave to amend pleadings should be freely granted unless it results in prejudice to the other party. *Voicestream Minneapolis, Inc. v. RPC Properties, Inc.*, 743 N.W.2d 267, 272 (Minn.2008). Even if there is no prejudice to the nonmoving party, the court may also properly deny a motion to amend when it would serve no useful purpose. *See Envall v. Indep. Sch. Dist. No. 704*, 399 N.W.2d 593, 594 (Minn.App.1987) ("The trial court properly denied appellant's motion to amend his complaint when the amendment served no useful purpose and was merely a reiteration of claims in the original complaint."), *review denied* (Minn. Mar. 25, 1987). Because the evidence presented in the first complaint was sufficient to conclude that the operating reserve fund was being used to pay start-up costs, not current expenses, allowing Bridgewater leave to file its first amended complaint would not have served a purpose.

Furthermore, the "public convenience" requirement in the statute did not prohibit Monticello from contracting with Hiawatha. Thus, evidence regarding this relationship would not change the fact that the bonds were issued pursuant to statutory authority. Because the first amended complaint would not have served a useful purpose and the case would still have been properly dismissed, the district court did not abuse its discretion in denying Bridgewater's motion to file its first amended complaint.

The second amended complaint sought to add an additional claim for relief. As stated above, leave to amend pleadings

5. We acknowledge that reasonable minds could disagree on this subject and that the dissent makes some thoughtful points. However, on balance we think that the scales tip in favor of ruling that the limited costs associated with the project are not current expenses.

should be freely granted unless it results in prejudice to the other party. *Voicestream Minneapolis,* 743 N.W.2d at 272. Generally, defending an additional claim is not sufficient prejudice to disallow amendment. *See Hughes v. Micka,* 269 Minn. 268, 275, 130 N.W.2d 505, 510 (1964). If the amendment will produce significant delay, however, it may be denied. *Id.* at 275–76, 130 N.W.2d at 510–11.

Time is of the essence in this litigation. *See* Minn.Stat. § 562.04 (2008) ("Whenever a bond has been required in any action under section 562.02, the court shall advance the case on its calendar for trial at the earliest feasible date, or the court may advance for trial only the issues which affect the public body."). This additional claim would have produced significant delay.[6] Bridgewater asserts that it was prejudiced by the denial of leave to amend because it will likely need to post a second surety bond to bring this claim as a separate action. But, as Monticello articulates, it is the prejudice to the nonmoving party that should be considered when assessing amended complaints, and the additional claim would have prejudiced Monticello by delaying its access to the proceeds of the bonds and impeding construction on the Fiber Project. In response, Bridgewater argues that the district court could have directed final judgment as to the original complaint, which would have allowed for appeal of the original complaint's dismissal, and then proceeded with the second amended complaint's additional claim without requiring Bridgewater to file another lawsuit. This might have been an option. Nonetheless, the district court denied Bridgewater leave to file the second amended complaint, without ruling on the merits of the additional claim, and this was not an abuse of discretion.

## DECISION

The Fiber Project qualifies as a public convenience, and therefore revenue bonds can be issued to finance its creation. Although Monticello cannot use the bond money to pay current expenses, the district court did not err in dismissing Bridgewater's complaint because Monticello is using the operating reserve fund to pay start-up costs and not current expenses. Lastly, the district court did not abuse its discretion in denying Bridgewater's motions to amend the complaint.

**Affirmed.**

HUDSON, Judge (concurring in part, dissenting in part).

I concur with the majority opinion's conclusion that the Fiber Project is a "utility or other public convenience" under Minn. Stat. § 475.52, subd. 1 (2008). I also agree that Minn.Stat. § 475.52, subd. 1, prohibits the use of any bond money to pay current expenses.[1] But I disagree that the $1.25 million in bond proceeds set aside in the operating reserve fund were properly

**6.** Monticello is losing a substantial amount of money each day that litigation delays installation of the Fiber Network. One estimate is $2,730,268 lost for an 11–month delay. Moreover, placing the bond proceeds in escrow required that the city pay the bond purchasers interest on the bonds until the escrow is released. As a result, Monticello will be required to pay the bondholders approximately $85,000 for every month the lawsuit continues.

**1.** Although I concur with the majority opinion's interpretation of Minn.Stat. § 471.52, subd. 1, respondent's interpretation of the statute is not without some appeal. I note, however, that even if respondent's interpretation is correct—that the current—expense limitation in the second sentence of subdivision 1 does not apply to the first sentence in subdivision 1–there is no express authority in the first sentence allowing respondent to pay current expenses from bond proceeds.

characterized as permissible start-up costs. Accordingly, I respectfully dissent from the majority opinion's conclusion that the district court did not err by granting respondent's motion to dismiss. I also respectfully dissent from the conclusion that the district court did not abuse its discretion by refusing to allow appellant to file the first amended complaint.

*Dismissal of appellant's claim*

Appellant's claim was improperly dismissed for two reasons. First, the dismissal of appellant's claim on a rule 12 motion was premature. In determining whether a complaint fails to state a claim upon which relief can be granted, the court considers only the facts alleged in the complaint, accepting those facts as true, and construes all reasonable inferences in favor of the non-moving party. *See Hebert v. City of Fifty Lakes,* 744 N.W.2d 226, 229 (Minn.2008) (quotation omitted). Accepting the facts as alleged by appellant in its complaint leads only to the conclusion that respondent's costs were current expenses and therefore prohibited under the statute. Moreover, the district court's findings to the contrary contradict the well pleaded allegations of the complaint and constitute reversible error. *See In re Milk Indirect Purchaser Antitrust Litig.,* 588 N.W.2d 772, 775 (Minn.App.1999) (reversing a rule 12 dismissal where the complaint set forth a legally sufficient claim).

At a minimum, the parties' dispute over the proper characterization of start-up costs and current expenses demonstrates that there is a material factual dispute regarding the definition of these dispositive terms. And that dispute cannot be resolved absent further discovery and possibly expert testimony regarding the generally accepted definitions of these terms, particularly in the revenue bond context.

Second, a careful review of the record reveals that many of respondent's start-up costs, if not all of them, can be accurately characterized as current expenses. The indenture defines operating and maintenance expenses to include *"any other current expenses* or obligations required to be paid by the City." (Emphasis added.) The majority opinion acknowledges this language but effectively dismisses it, noting that the indenture also indicates that these costs would only be paid for a three-year start-up period and are "nonrecurring." But the three-year start-up period has no statutory basis and appears to have been arbitrarily selected by respondent.

More importantly, additional statements in the indenture further suggest that the identified expenses are more ongoing in nature. For example, the indenture provides that the Fiber Project will launch with seven employees, including "two inside technicians to take care of electronics, two outside technicians to maintain the fiber network, two customer service representatives to take orders and communicate with the public, and one market/salesperson.... The employees ... will be employees of the City and will receive city benefits." While the salaries of these employees might charitably be characterized as start-up costs, without additional information about the terms and duration of their employment, these salaries and benefits sound suspiciously like typical payroll and benefit obligations of any municipality.

In other words, these salaries appear to be current expenses of the municipality and are no different than the salaries and benefits municipalities pay to their firefighters and police officers—payments which are to be made out of general revenue funds. *See* Op. Att'y Gen. 471K (May 12, 1961) (stating that salary payments are current expenses and not one of the enumerated purposes for which bonds may be issued). By contrast, appellant persuasively argues that true start-up costs only

include items such as necessary professional planning studies, legal and financial advice, and printing and publication costs. *See* Minn.Stat. § 475.65 (2008).

The majority opinion also relies on *Otter Tail Power Co. v. Vill. of Wheaton,* 235 Minn. 123, 49 N.W.2d 804, 810 (1951), for the proposition that respondent is "permitted to use funds allocated to the Operating Reserve Fund as an implied power to be used in carrying out an expressly authorized power." But *Otter Tail* is of little help because, there, most of the contested expenses were costs clearly related to making the power plant operational, such as fuel costs. 49 N.W.2d at 810. The contested costs here are not so easily delineated or categorized, as evidenced by the divergent views posited by the parties. Moreover, *Otter Tail* does not address Minn.Stat. § 475.52 or its prohibition on current expenses.

The majority opinion aptly observes that the costs in question—$1.25 million—are a relatively small percentage (approximately 4.9%) of the total cost of the project. But the broader principle is a significant one, and that is that statutory cities have "no inherent powers and possess only such powers as are expressly conferred by statute or implied as necessary in aid of those powers which have been expressly conferred." *State v. Kuhlman,* 729 N.W.2d 577, 580 (Minn.2007) (quotation omitted). Minn.Stat. § 475.52 makes clear that revenue bonds are appropriate for significant capital improvements, including the costs to realize those improvements. But nothing in the statute authorizes revenue bonds to be used to pay the current expenses of a statutory city. *Any* encroach-

ment that effectively expands that statutory authority sets a dangerous precedent.

Because further discovery was necessary in order to discern the proper characterization of respondent's costs, the dismissal of appellant's claim was premature.[2] Moreover, the record indicates—contrary to the district court's determination—that many of the disputed costs can be characterized as current expenses that cannot be paid through the issuance of bonds. Thus, whether the operating reserve fund is being used to fund start-up costs or pay current expenses is a disputed question of fact that, at this stage in the proceedings, is not ripe for resolution. The district court, therefore, erred by dismissing appellant's claim.

*Appellant's motion to amend*

In the first amended complaint, appellant sought to add additional facts—gleaned from the newly acquired indenture—to support its allegations in the original complaint that respondent intended to use the bond proceeds to pay current expenses. The majority opinion concludes that the evidence presented in the first complaint was sufficient to establish that the operating reserve fund was being used solely to pay start-up costs; thus, the amended complaint would have served no purpose. I disagree.

Contrary to the majority opinion's determination, the evidence presented in the first complaint did not conclusively show that the operating reserve fund was being used solely to pay start-up costs. Instead, the record suggests the opposite: many of the disputed costs appear to be current expenses that cannot be paid through any type of bond. The facts appellant discovered from the newly acquired indenture

2. Ideally, the district court would have afforded the parties the opportunity to submit any expert testimony or other evidence they deemed helpful to the district court's determi-

nation of whether all or a portion of the operating reserve fund is being used to fund current expenses.

went directly to determining whether respondent was using the bond proceeds to pay permissible start-up costs, or whether the bond proceeds were being used for prohibited current expenses. As a result, the amended complaint would have provided additional evidence and clarification on the precise issue in dispute.

Minn. R. Civ. P. 15.01 provides that amendments should be liberally granted. On this record, I would conclude that the district court abused its discretion in denying appellant's motion to file the first amended complaint.

Because I would conclude that it was error to dismiss appellant's claim and an abuse of discretion to deny appellant's motion to file the first amended complaint, I would reverse the district court and remand for further proceedings.