*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-2378,
A14-0467**

Ken B. Peterson,
Commissioner of the Minnesota Department of Labor and Industry,
Respondent,

vs.

United Parcel Service, Inc.,
Appellant.

**Filed September 22, 2014
Affirmed
Cleary, Chief Judge
Concurring in part, dissenting in part, Rodenberg, Judge**

Ramsey County District Court
File No. 62-CV-13-5652

Lori Swanson, Attorney General, Jackson Evans, Assistant Attorney General, St. Paul, Minnesota (for respondent)

Joseph G. Schmitt, Peter Gray, Lisa M. Schmid, Nilan Johnson Lewis PA, Minneapolis, Minnesota; and

Carla Gunnin (pro hac vice), Jackson Lewis P.C., Atlanta, Georgia (for appellant)

Considered and decided by Worke, Presiding Judge; Cleary, Chief Judge; and Rodenberg, Judge.

UNPUBLISHED OPINION

**CLEARY**, Chief Judge

In these consolidated appeals arising from enforcement actions asserted by respondent, appellant argues that the district court lacked jurisdiction to issue temporary and permanent injunctions, and that it erred by entering a temporary injunction, denying appellant's motion to amend its answer, and granting respondent's motion for summary judgment. We affirm.

## FACTS

Appellant United Parcel Service, Inc. (UPS) is a multi-national package-delivery company that operates a network of distribution and retail establishments, including distribution facilities in Minneapolis and Maple Grove. At both of those facilities, UPS employees load and unload tractor-trailers and package delivery trucks; some of those vehicles enter and exit the buildings through large doors, while others are serviced via exterior loading docks with overhead doors. In spite of efforts to minimize the amount of outdoor air entering the buildings, it can be difficult to maintain comfortable indoor working temperatures during the winter.

Prior to the fall of 2009, thermostats in these facilities were typically set at 50 degrees Fahrenheit during the winter months. In September 2009, UPS required that thermostats in operations areas be set to 45 degrees during the winter heating season in order to reduce costs and save energy. As temperatures fell with the arrival of winter, many employees found this temperature to be less comfortable and added layers of long underwear, sweatshirts, hats and gloves to their working attire. On December 10, 2009,

an inspector from the Occupational Safety and Health Division of the Minnesota Department of Labor and Industry (MnOSHA) went to the Maple Grove facility in response to a complaint that temperatures in the operations area were below freezing. He found the thermostat set at 45 degrees, and his measurements showed that temperatures in the operations area ranged from 48 to 55 degrees. Outdoor temperatures in Maple Grove varied from seven degrees above zero to seven degrees below zero that day. On December 28, an inspector measured indoor temperatures at the Minneapolis facility ranging from 54 to 62 degrees, while outdoor temperatures ranged from a high of 25 degrees to a low of 13 degrees.

In January 2010, based on data from the December 2009 inspections, MnOSHA issued violation citations for both facilities asserting violations of Minn. R. 5205.0110, subp. 3, which requires employers to maintain a minimum temperature of 60 degrees Fahrenheit in any "indoor workrooms" where "work of a strenuous nature is performed, unless prohibited by process requirements." The rules do not define "indoor workrooms." Abatement of the violations was stayed when UPS timely contested the citations, and the matter was heard by an administrative-law judge (ALJ). Arguments presented to the ALJ focused on whether the UPS facilities should be treated as indoor workrooms under Minn. R. 5205.0110, or as garages under Minn. R. 5205.0200. The rule governing garages imposes ventilation requirements focused on maintaining air quality but does not impose a minimum-temperature requirement.

The ALJ reversed the violation citations, concluding that the UPS facilities fell within the garage standard. The commissioner appealed to the MnOSHA board, which

3

heard the matter in November 2012. The MnOSHA board reversed the ALJ and upheld the citations, concluding that both the garage standard *and* the indoor-workroom standard apply. UPS timely filed a certiorari appeal of the MnOSHA board's decision but failed to properly serve the other parties. We discharged the writ and dismissed the appeal due to defective service and the supreme court denied review.

On three occasions in early 2013, a MnOSHA inspector attempted to conduct follow-up inspections at the Minneapolis and Maple Grove facilities. UPS personnel refused to allow the inspections, even after a police officer reviewed the inspection order and advised a UPS manager to permit the inspection. MnOSHA ultimately obtained a warrant from the Hennepin County District Court. Finally, on March 7, armed with the warrant and accompanied by two Hennepin County Sheriff's Deputies, the inspector went to the Minneapolis facility and was able to complete an inspection. Temperature readings ranged from 48 to 63 degrees, with 23 out of 27 readings falling below 60 degrees. The outside temperature that day ranged from 11 degrees to 21 degrees. In June, MnOSHA issued a failure-to-abate citation and a citation for failure to submit a certification showing how the violation was corrected as required by Minn. R. 5210.0532, subp. 2.[1]

In August 2013, the commissioner sued UPS in Ramsey County District Court to enforce the decision of the MnOSHA board affirming the 2010 violation citations. In his complaint, the commissioner asked the district court to "order [UPS] to set the

---

[1] UPS contested the additional citations and the case was scheduled for a hearing before a different ALJ. The commissioner moved for summary disposition and the ALJ granted the motion, affirming the failure-to-abate citations. At oral argument for this appeal, UPS stated that it had appealed the second ALJ's decision to the MnOSHA board. That matter has not yet reached this court.

4

temperature to sixty degrees in its distribution centers when the outside temperature is below sixty degrees" and issue a permanent injunction to the same effect. A flurry of filings followed: On August 20, UPS filed its answer, admitting that the MnOSHA board's decision was a "final order" and that UPS did not change thermostat settings after that decision. On September 6, the commissioner moved for summary judgment, proposing an order "requiring that [UPS] set the thermostat to 60 degrees in *all of its Minnesota distribution centers* whenever the outdoor temperature is below sixty degrees." (Emphasis added.) On October 7, UPS moved for leave to amend its answer by adding affirmative defenses and a counterclaim. On October 21, the commissioner moved for a temporary injunction requiring UPS to "set the temperature setting to 60 degrees in all of its Minnesota distribution centers when the outdoor temperature is below sixty degrees."

The parties appeared before the district court in November 2013. In December, the district court granted the commissioner's motion for a temporary injunction, ordering UPS "to set the temperature setting to sixty (60) degrees *in each of its Minnesota distribution centers* when the outdoor temperature is less than sixty degrees." (Emphasis added.) UPS requested clarification of the scope of the temporary injunction, noting that the MnOSHA board's decision pertained to the Maple Grove and Minneapolis facilities for which citations had been issued and requesting that the order be amended to apply to those facilities only. While that request was pending, UPS filed a notice of appeal to this court. That appeal was designated as case A13-2378, which is the parent file in this

5

appeal.  On January 8, 2014, the district court declined to modify the temporary injunction, stating that it lacked jurisdiction to do so because UPS had appealed.

In February 2014, the district court issued a second order to address the outstanding motions.  The second order denied UPS's motion for leave to amend its answer, granted the commissioner's motion for summary judgment and permanently ordered UPS to set thermostats at 60 degrees when the outside temperature falls below 60 degrees.  UPS appealed the second order.  The second appeal is case number A14-0467, the consolidated file in this appeal.

The commissioner moved to dismiss appeal A13-2378, arguing that the temporary injunction was mooted by the district court's imposition of the permanent injunction.  We denied the motion, concluding that whether the temporary injunction is moot depends on the outcome of the appeal of the permanent injunction.  In the same order, we granted a motion by UPS to consolidate the two cases and struck A13-2378 from the oral argument calendar.  Consolidated oral argument occurred in July of this year.  We now consider the consolidated appeal.

## D E C I S I O N

**I.**     **The district court did not err by denying UPS's motion for leave to amend.**

We review a district court's denial of a motion to amend pleadings for abuse of discretion.  *Johns v. Harborage I, Ltd.*, 664 N.W.2d 291, 295 (Minn. 2003).  "Whether the district court has abused its discretion in ruling on a motion to amend may turn on whether it was correct in an underlying legal ruling."  *Doe v. F.P.*, 667 N.W.2d 493, 500–01 (Minn. App. 2003), *review denied* (Minn. Oct. 21, 2003).  In other words, "[a] district

court abuses its discretion when it bases its conclusions on an erroneous interpretation of the applicable law." *Fannie Mae v. Heather Apartments Ltd. P'ship*, 811 N.W.2d 596, 599 (Minn. 2012). Leave to amend should be freely given if the opposing party would not be prejudiced. *Fabio v. Bellomo*, 504 N.W.2d 758, 761 (Minn. 1993). But even if amendment would not prejudice the opposing party, a district court may properly deny amendment if it would be futile. *Bridgewater Tel. Co. v. City of Monticello*, 765 N.W.2d 905, 915 (Minn. App. 2009).

In this instance, our review is effectively de novo because the district court based its denial decision on two legal conclusions that, if correct, would make amendment futile. First, the district court concluded that UPS's amended claim would amount to an appeal of the decision of the MnOSHA board, and that it lacked subject-matter jurisdiction over such a claim because MnOSHA-board decisions are appealable only by writ of certiorari to this court. Second, it concluded that the amended claim would be barred by the doctrine of res judicata because the arguments asserted were waived when UPS failed to perfect its certiorari appeal of the MnOSHA board's decision, resulting in our dismissal of that appeal. We review questions of subject-matter jurisdiction de novo. *Johnson v. Murray*, 648 N.W.2d 664, 670 (Minn. 2002). The applicability of res judicata is also a question of law subject to de novo review. *State v. Joseph*, 636 N.W.2d 322, 326 (Minn. 2001). Thus, our review of the district court's overall decision to deny the motion to amend turns on our de novo review of the district court's legal conclusions.

In Minnesota, writs of certiorari are creatures of statute, not common-law, and the statutes governing them must be strictly construed. *State ex rel. Ryan v. Civil Serv.*

7

*Comm'n of Minneapolis*, 278 Minn. 296, 301, 154 N.W.2d 192, 196 (1967). The Minnesota Occupational Safety and Health Act of 1973 (the act), Minn. Stat. §§ 182.65–.676 (2012) provides a statutory avenue for judicial review of administrative decisions arising from contests of MnOSHA citations that ultimately leads to appeal to this court by writ of certiorari. First, a citation is contested before an ALJ. Minn. Stat. § 182.661, subd. 3. Second, the employer or the commissioner may appeal the ALJ's decision to the MnOSHA board. *Id.* Third, the MnOSHA board's decision may be appealed "in accordance with the applicable provisions of [the Minnesota Administrative Procedure Act (MAPA)]." Minn. Stat. § 182.665. Under MAPA, a writ of certiorari "must be filed with the Court of Appeals." Minn. Stat. § 14.63 (2012). Additionally, this court has statutory jurisdiction over "the decisions of administrative agencies in contested cases." Minn. Stat. § 480A.06, subd. 4 (2012). We also have jurisdiction to issue writs of certiorari to agencies, with exceptions that do not apply here. *Id.*, subd. 3 (2012). Absent express statutory language vesting judicial review of an agency action in the district courts, our jurisdiction in these matters is exclusive. *Mowry v. Young*, 565 N.W.2d 717, 719 (Minn. App. 1997), *review denied* (Minn. Sept. 18, 1997). As the district court noted, there is no statute or rule that authorizes district court review of MnOSHA-board decisions.

UPS argues that the district court has jurisdiction to hear its amended claims because the defendant in an agency-enforcement action is entitled to collaterally attack the validity of the regulation the agency seeks to enforce, and cites caselaw to support that assertion. UPS relies heavily on the supreme court's statement in *State v. Lloyd A.*

*Fry Roofing Co.*, 310 Minn. 528, 530, 246 N.W.2d 696, 698 (1976), that "any action of an administrative agency which is in excess of its statutory power is subject to collateral attack." This reliance is misplaced because *Fry* is distinguishable. There, the Minnesota Pollution Control Agency (MPCA) ordered Fry to conduct emissions tests and Fry refused without seeking judicial review. *Id.* at 528, 246 N.W.2d at 697. When the MPCA sought an injunction compelling Fry to conduct the tests, Fry responded by collaterally attacking the validity of the rule, and the district court ruled that the MPCA lacked statutory authority to promulgate the rule it sought to enforce. *Id.* On appeal, the MPCA argued that Fry could not collaterally attack the rule, citing U.S. Supreme Court cases and other authorities supporting the position that parties may not collaterally attack when applicable statutes provide an exclusive avenue for appeal. *Id.* at 529–30, 246 N.W.2d at 697–98. The supreme court rejected the MPCA's argument and held that collateral attack was permissible because the governing statute in that case provided for direct appeal, but did not make direct appeal the exclusive means of review. *Id.* at 530, 246 N.W.2d at 698. Here, the governing statutes provide certiorari appeal to this court as the exclusive avenue for review. UPS had full access to certiorari appeal, but failed to perfect its appeal when it had the opportunity to do so.

UPS also disputes the district court's interpretation of *Carlson v. Chermak*, 639 N.W.2d 886 (Minn. App. 2002), which the district court read as supporting its conclusion that it lacked subject-matter jurisdiction. UPS reads *Carlson* as supporting the opposite result. We conclude that *Carlson* supports the district court's interpretation. Carlson applied for a zoning variance and her application was denied by a county zoning board.

9

*Id.* at 888. The governing statute provided for direct appeal to the district court. *Id.* at 889. Carlson did not directly appeal the denial of the variance, but after the time for appeal had passed, she filed a district court declaratory-judgment action amounting to a collateral attack. *Id.* at 888. We concluded that the district court lacked subject-matter jurisdiction to consider the declaratory-judgment action because Carlson was asserting claims that she could have asserted in the direct appeal provided for by the statute. *Id.* at 890.

UPS seizes on footnote language in which we stated that the outcome would have been different if the county had brought an enforcement action against Carlson, because in that case an "aggrieved part[y] may raise constitutional, equitable, and other defenses to enforcement whether or not [she] appealed denial of a variance within the statutory appeal period." *Carlson*, 639 N.W.2d at 889 n.1. The footnote language is inapplicable here for two reasons. First, it is dictum, meaning "a statement in an opinion that could have been eliminated without impairing the result of the opinion." *State v. Misquadace*, 629 N.W.2d 487, 490 n.2 (Minn. App. 2001), *aff'd*, 644 N.W.2d 65 (Minn. 2002). Elimination of the footnote from the *Carlson* opinion would have no impact on the result of the opinion because whether a collateral attack on an enforcement action is permissible was not at issue there. Second, even if the passage was not dictum, we said that such a collateral attack would be permissible "[i]n the distinct procedural posture of a county's action to enforce an ordinance against landowners." *Carlson*, 639 N.W.2d at 889 n.1. We did not address whether a district court collateral attack on a MnOSHA standard

10

would be permissible when statutes provide certiorari appeal to this court as the exclusive avenue for appeal of an agency decision affirming a citation based on that standard.

We conclude that the district court correctly decided that it lacked subject-matter jurisdiction to consider UPS's collateral attack. Because the lack of subject-matter jurisdiction alone made amendment of UPS's answer futile, providing sufficient basis for the district court to deny the motion to amend, we need not address UPS's res judicata arguments.

## II.     The district court did not err by granting summary judgment.

"On appeal from summary judgment, [appellate courts] must review the record to determine whether there is any genuine issue of material fact and whether the district court erred in its application of the law." *Dahlin v. Kroening*, 796 N.W.2d 503, 504 (Minn. 2011). "We review a district court's summary judgment decision de novo." *Riverview Muir Doran, LLC v. JADT Dev. Grp., LLC*, 790 N.W.2d 167, 170 (Minn. 2010) (citation omitted). "A motion for summary judgment shall be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that either party is entitled to a judgment as a matter of law." *Fabio v. Bellomo*, 504 N.W.2d 758, 761 (Minn. 1993) (citation omitted). "On appeal, the reviewing court must view the evidence in the light most favorable to the party against whom judgment was granted." *Id.*

UPS supports its assertion that the district court's grant of summary judgment must be reversed with three arguments. Its first argument is that because the district court

erred by denying UPS's motion to amend, summary judgment was premature. We reject that argument because we have already concluded that the district court did not err by denying the motion to amend.

UPS's second argument is that its contest of the 2013 failure-to-abate citations functions as a stay of abatement as to the 2010 violation citations, precluding summary judgment based on the latter until the contest of the former is resolved. We disagree.

Minnesota law provides that an employer may contest a violation citation, and that if the employer fails to do so, the citation becomes a "final order of the commissioner . . . not subject to review by any court or agency." Minn. Stat. § 182.661, subd. 1. An identical provision applies to failure-to-abate citations. *Id.,* subd. 2. And "[t]he commissioner may bring an action in district court for injunctive or other appropriate relief including monetary damages if the employer fails to comply with a final order of the commissioner." *Id.,* subd. 2a. UPS reads these three subdivisions as describing a three-step process in which a violation citation must be followed by a failure-to-abate citation before the commissioner may seek an injunction under subdivision 2a. That reading is incorrect. The text of the statute plainly shows that subdivision 2a is not, as UPS contends, "a subpart of . . . subd. 2." Instead, it is a subdivision of equal stature with subdivisions 1 and 2. Additionally, the statute does not provide that only a failure-to-abate citation may become a final order of the commissioner. Subdivision 1 provides that an unappealed violation citation may become a final order regardless of whether a failure-to-abate citation is issued later. This distinction is important because it lays the groundwork for a violation citation to become a final order after review by the MnOSHA

12

board. An employer who contests either type of citation need not abate the alleged violation until the contested-case process has run its course. *Id.,* subd. 2. For contests that reach the MnOSHA board, the contested-case process ends with the board's decision unless the employer appeals to this court under MAPA. Minn. Stat. § 182.665. The statute describing MnOSHA-board review does not expressly state that the MnOSHA board's decision becomes a final order if not appealed, but that is the thrust of the relevant provisions when read as a whole. The statutory language does not support UPS's argument that the pendency of a contest of a failure-to-abate citation prevents a previously issued violation citation from becoming a final order when the violation-citation contest has run its course. Accordingly, we conclude that UPS's contest of the 2013 failure-to-abate citation does not function as a stay of abatement as to the 2010 violation citations, and therefore does not preclude the issuance of summary-judgment injunctive relief enforcing the 2010 violation citations.

UPS's third argument is that genuine issues of material fact preclude granting summary judgment. The foregoing statutory analysis also relates to this third argument because the statute identifies the facts that are material to the summary-judgment motion. Statutory injunctive relief is available to the commissioner under section 182.661, subd. 2a when (1) a citation of either type becomes a final order; and (2) the employer fails to comply with it.[2] Thus, the only facts relevant to the commissioner's motion for summary judgment are whether the violation citations issued in 2009 became final orders, and, if

---

[2] Much more is required for equitable injunctive relief. *See Dahlberg Bros. v. Ford Motor Co.*, 272 Minn. 264, 274–75, 137 N.W.2d 314, 321–22 (1965) (describing five considerations relevant to granting an equitable injunction).

13

they did, whether UPS complied with them. In its answer, UPS admitted that the MnOSHA board's decision was a final order, and that it had not changed thermostat settings after that decision. UPS urges us to consider several other facts as material to the summary-judgment motion, including whether the indoor-workroom temperature standard applies to its facilities; whether the temperature levels measured in its facilities have any health or safety effects on its workers; whether compliance is technically feasible; whether there are alternative means of compliance; whether the commissioner or the legislature should clarify the applicability of the temperature standard; and whether compliance must be waived because it is prohibited by process requirements. None of these facts are material to the summary judgment motion because none of them relate to whether UPS has complied with the final order. Instead, they relate to whether UPS is *required* to comply. That ship has sailed. UPS waived the argument that compliance is not required when it failed to perfect its certiorari appeal.

In sum, UPS has admitted that the 2010 violation citations became final orders when the MnOSHA board affirmed them, but it has never asserted that it has complied with those final orders or even attempted to comply, or that facts might exist that could demonstrate compliance or attempted compliance. We therefore conclude that the district court did not err by granting the commissioner's motion for summary judgment because there are no genuine issues about facts material to the grant of statutory injunctive relief under section 182.661, subd. 2a.

**III.    The district court did not lack authority to issue the permanent injunction.**

As to the authority of the district court to issue the permanent injunction, UPS frames its argument in terms of subject-matter jurisdiction. We review questions of subject-matter jurisdiction de novo. *Johnson*, 648 N.W.2d at 670. Here, the injunction at issue is a creature of statute. Whether the district court had subject-matter jurisdiction to consider the commissioner's motion depends on whether the statutory prerequisites were met. We have already concluded that they were, and we accordingly conclude that the district court had subject-matter jurisdiction to consider the commissioner's motion. We also conclude that this issue is better framed as an inquiry into the *scope* of the district court's authority to actually issue the injunction.

"The granting of an injunction generally rests within the sound discretion of the [district] court, and its action will not be disturbed on appeal unless, based upon the whole record, it appears that there has been an abuse of such discretion." *Cherne Indus., Inc. v. Grounds & Assocs., Inc.*, 278 N.W.2d 81, 91 (Minn. 1979). "[W]here injunctive relief is explicitly authorized by statute . . . proper exercise of discretion requires the issuance of an injunction if the prerequisites for the remedy have been demonstrated and the injunction would fulfill the legislative purposes behind the statute's enactment." *Wadena Implement Co. v. Deere & Co.*, 480 N.W.2d 383, 389 (Minn. App. 1992), *review denied* (Minn. Mar. 26, 1992).

UPS argues that the district court's injunctive authority is limited to the two facilities for which MnOSHA issued violation citations, and that the scope of the

15

injunction must be limited correspondingly.[3] Whether that argument prevails depends on whether the scope of the injunction constituted an abuse of discretion, which in turn depends on whether that scope would fulfill the legislative purposes behind the act's enactment. Stated another way, the question before us is whether the issuance of an injunction applicable to *all* of UPS's Minnesota distribution facilities fulfills the legislative purposes behind the enactment of the act.

The Minnesota Occupational Safety and Health Act of 1973 includes a statement of the legislature's many purposes for enacting it. Minn. Stat. § 182.65, subd. 2 (2012). That statement indicates that the act is intended to, among other things, promote "the earnest cooperation of government, employers and employees," *id.*, and "to assure so far as possible every worker in the state of Minnesota safe and healthful working conditions, . . ." *id.,* subd. 2(b). To achieve those purposes, the act gives the commissioner authority to "promulgate and enforce mandatory occupational safety and health standards applicable to employers and employees in the state of Minnesota." *Id.*, subd. 2(b)(1). The act backstops the commissioner's authority by providing that the district courts may issue "injunctive or other appropriate relief including monetary damages if the employer fails to comply with a final order of the commissioner." Minn. Stat. § 182.661, subd. 2a. The provision for injunctive relief does not limit the scope of the relief a district court may issue.

---

[3] The order states that "[UPS] shall immediately set the temperature to sixty (60) degrees in its distribution centers when the outside temperature is below sixty (60) degrees." UPS does not dispute that the permanent injunction is intended to apply to all 31 of its Minnesota distribution centers.

16

Here, it is undisputed that after UPS ordered thermostat settings to be lowered to 45 degrees during the winter months, employee complaints about cold temperatures in the distribution facilities led to inspections, which in turn revealed that thermostats were set at 45 degrees, and that temperatures were below the standard for indoor workrooms. UPS timely asserted its statutory right to dispute those citations and the process followed the course provided by statute, proceeding to an ALJ, and then to the MnOSHA board. But even after the 2010 violation citations became final orders, by virtue of the MnOSHA board's affirmance and UPS's failure to perfect its appeal, UPS took no steps to comply with those final orders. When MnOSHA attempted to verify whether UPS had complied by conducting follow-up inspections, UPS repeatedly refused to cooperate, and the inspector was unable to complete an inspection until MnOSHA obtained a warrant and the inspector was accompanied by sheriff's deputies. UPS consistently behaved in an intransigent manner, treating MnOSHA inspectors and final orders with contempt.

Under these facts, we conclude that the district court did not overreach by ordering UPS to raise the temperature settings in all of its Minnesota facilities. The scope of the injunction served the legislative purpose of promoting employer cooperation by demonstrating to employers that the district courts will exercise their injunctive authority to enforce final orders of the commissioner. It also served the purpose of assuring that as many Minnesota workers as possible will work in safe and healthful conditions by extending the effect of the commissioner's final orders to every worker in every UPS distribution center in this state. The effect of the final orders was to ensure that workers in the Minneapolis and Maple Grove facilities would work in an environment consistent

17

with the indoor air temperature standard. The effect of the injunction was to overrule a UPS policy that demonstrably leads to working conditions not consistent with that standard.

UPS's persistent noncompliance further justifies the scope of the injunction. The record shows that UPS has refused to abate, or even try to abate, violations first identified in 2009. At the time the commissioner sought the injunction the original violations were almost four years old, MnOSHA had verified UPS's noncompliance by conducting a follow-up inspection, and UPS had resisted MnOSHA's efforts to such an extent that MnOSHA had obtained a search warrant and a law-enforcement escort. Under those circumstances, the district court could reasonably conclude that UPS might similarly resist MnOSHA's efforts with regard to all of its other facilities, and that the process of inspecting them all, issuing citations, pursuing the administrative process, and issuing injunctions would take years. In the meantime, during the winter months, workers in those facilities presumably would be exposed to conditions not compliant with the indoor-air-temperature standard, which would frustrate the legislative purposes behind the statute's enactment.

Because the act does not limit the scope of an injunction to the enforcement of specifically identified and cited violations, we conclude that under the unique facts of this case the injunction, as issued, serves the legislative purpose of the act, and is therefore valid.

**IV.    The validity of the temporary injunction is moot.**

Early in the procedural history of this appeal, the commissioner moved to dismiss appeal A13-2378, arguing that the temporary injunction was mooted by the district court's imposition of the permanent injunction.  We denied the motion, concluding that whether the temporary injunction is moot depends on the outcome of the appeal of the permanent injunction.  Because we conclude that the permanent injunction is valid, we also conclude that the arguments regarding the temporary injunction it superseded are moot, and we do not address them.

**Affirmed.**

**RODENBERG**, Judge (concurring in part, dissenting in part)

I concur with the court's opinion in all respects except concerning the scope of the permanent injunction. On that issue, I respectfully dissent.

As an initial matter, UPS frames this issue as one of subject-matter jurisdiction, presumably to deflect the commissioner's assertion that UPS has waived any argument concerning the scope of the injunction by failing to raise them before the district court. *See, e.g.*, *Tischer v. Hous. & Redev. Auth. of Cambridge*, 693 N.W.2d 426, 430 (Minn. 2005) (citing Minn. R. Civ. P. 12.08(c)) (stating that subject-matter jurisdiction may not be waived). In my view, the district court was vested with subject-matter jurisdiction when the citations issued in 2010 became final orders and UPS preserved arguments about the injunction's scope by broadly challenging the validity of the injunction. The arguments UPS now asserts are implicit in those it asserted before the district court. Both parties have fully briefed the issue, and our decision does not hinge on new or disputed facts. *See Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1998) (stating that an appellate court generally will not consider matters not argued to and considered by the district court); *but see Watson v. United Servs. Auto. Ass'n*, 566 N.W.2d 683, 687-88 (Minn. 1997) (recognizing and applying an exception for arguments that are "implicit in or closely akin to the arguments below," "raised prominently in briefing," and "not dependent on any new or controverted facts" (citation and quotation marks omitted)).

Although vested with subject-matter jurisdiction, the district court issued an injunction that is impermissibly broad. The original citations here were specific to the Maple Grove and Minneapolis UPS facilities, based on conditions personally observed

and measured by an OSHA inspector. UPS contested the citations, and the resulting decisions of the ALJ and the OSHA board pertain only to those two citations and those two facilities. The district court may issue an injunction when an "employer fails to comply with a final order of the commissioner." Minn. Stat. § 182.661, subd. 2a (2012). The final order of the commissioner related solely to the Maple Grove and Minneapolis facilities. In my opinion, the scope of the injunction available under subdivision 2a must be limited to those two facilities. That is what the statute plainly says.

The district court also analyzed its decision under the framework for equitable injunctions and concluded that enjoining UPS concerning facilities never inspected or cited was appropriate under equitable principles. I am not persuaded. In my view, the prerequisites for consideration of an equitable injunction were not met here, and even if they were, the district court wrongly based its equitable-injunction analysis on assumed facts.

One of the basic prerequisites for an equitable injunction is a showing that available legal remedies are inadequate. *Cherne Indus., Inc. v. Grounds & Assocs., Inc.*, 278 N.W.2d 81, 92 (Minn. 1979). Here, the legislature expressly provided for injunctive relief under section 182.661, subdivision 2a. The legislature also provided that the commissioner may impose increased fines when an employer demonstrates a pattern of noncompliance. *See* Minn. Stat. § 182.666, subds. 1 (providing for fines of up to $70,000 for willful or repeated violations), 4 (providing for fines of up to $7,000 per day for failure to correct a cited violation) (2012). The commissioner has made no showing that these legal remedies are inadequate. Instead, it is suggested that OSHA's enforcement

efforts would be hampered by limiting the injunction's scope to the cited facilities because to enforce the temperature standard at the other 29 locations, OSHA would have to inspect them all, issue citations if violations are found, and pursue the administrative process for each citation. In other words, for each facility, OSHA would have to follow the process the legislature has provided. But the legislature has addressed that concern by providing for enhanced penalties if an employer wilfully or repeatedly violates OSHA rules or fails to correct violations. And the legislature has also authorized the district court to impose "other appropriate relief including monetary damages" to force compliance. Minn. Stat. § 182.661, subd. 2a. The legislature has provided a variety of legal tools for enforcement of OSHA rules. In the absence of a showing that these legal remedies are inadequate, the district court could not properly base a permanent injunction on equitable principles.

Even if the district court were to determine that the legal remedies are inadequate, its analysis of the *Dahlberg* factors is flawed. Based on the OSHA inspector's observations of the configuration and operation of the Maple Grove and Minneapolis facilities, the ALJ ruled that those two facilities are governed by the standard applicable to garages. The OSHA board reversed that decision and concluded that the garage standard *and* the indoor-workroom standard apply to those two facilities. Based on this record, the commissioner, the district court, and this court have no idea at all about the configuration of the other 29 Minnesota UPS facilities, which OSHA standard (or standards) properly governs each of them, or what the temperatures are in each of those facilities. Yet the district court based its *Dahlberg* analysis on the unexamined,

unsupported assumption that the indoor-workroom standard applies to the 29 uninspected facilities and that the temperatures in all of them are below whatever temperature standard applies to each. By doing so, the district court bypassed the detailed statutory process within which the commissioner may penalize employers who do not comply with health and safety standards.

In sum, the permanent injunction here exceeds the scope of the underlying citations and is inconsistent with the plain language of the statute. On this record, there has been no showing that the detailed and multiple legal remedies made available by the legislature are inadequate so as to justify equitable relief. I would modify the injunction by limiting its scope to the Maple Grove and Minneapolis facilities.